MATTER OF TOSCANO-RIVAS et al.

In Bond Proceedings

A–19923806

*Decided by Board September 7, 1972 and April 6, 1973*
*Decided by Attorney General January 9, 1974*

(1) Sections 103 and 242 of the Immigration and Nationality Act authorize the inclusion in an appearance and delivery bond in connection with a deportation proceeding of a condition prohibiting unauthorized employment.

(2) Under 8 CFR 242.2(b), a special inquiry officer has authority to review and modify the conditions of a bond imposed by a district director in a deportation proceeding; under 8 CFR 3.1(b)(7), the Board of Immigration Appeals has authority to review, on appeal, a special inquiry officer's consideration of a bond determination made by a district director.

APPLICATION: Elimination of condition of bond prohibiting employment unless authorized by Immigration and Naturalization Service.

ON BEHALF OF RESPONDENTS:
 Emanuel Braude, Esquire
 215 W. 5th Street, Suite 910
 Los Angeles, Calif. 90013
 David Marcus, Esquire
 215 W. 5th Street
 Los Angeles, Calif. 90013
 Amicus Curiae:
 Jack Wasserman, Esquire
 Esther M. Kaufman, Esquire
 Association of Immigration and
  Nationality Lawyers
 1823 "L" Street, N.W., Suite 102
 Washington, D.C. 20036
 (Brief filed)

ON BEHALF OF SERVICE:
 Charles Gordon
 General Counsel
 Irving A. Appleman
 Appellate Trial Attorney
 (Brief filed)

**BEFORE THE BOARD**

(September 7, 1972)

The District Director appeals from an order of the special inquiry officer, dated August 4, 1972, which was rendered in bond redetermination proceedings incident to deportation proceedings.

In his order the special inquiry officer eliminated a bond condition imposed upon the respondents, according to which their acceptance of unauthorized employment would constitute a breach of their bonds. The appeal will be dismissed.

The cases relate to ten aliens, all natives and citizens of Mexico, all of whom were found to be deportable by the special inquiry officer on August 1, 1972. Each of the respondents has conceded deportability. Their appeals from the special inquiry officer's orders of August 1, 1972 are being dismissed today in separate orders.

We have been informed that respondent Perez Solorio has returned to Mexico, evidently taking advantage of the privilege of voluntary departure extended to her. Therefore, the District Director's appeal as to her has become moot.

Pending hearing in the deportation proceedings, the respondents were released on a $1,500 bond covering the entire group. The bond contained a condition inserted by the District Director to the effect that the respondents agree not to accept any employment unless authorized by the Service. The record reflects the fact that all ten respondents had been employed by the same company, California Originals of Torrance, California, a ceramics manufacturer. The bond condition against employment was obviously designed to prevent their further employment by California Originals.

When the special inquiry officer's orders of August 1, 1972 were entered, the first bond was vacated and new bonds were substituted in its place. The District Director set a $1,000 bond for each alien, and these new bonds contained the same condition with regard to employment as in the previous blanket bond. In bond determination proceedings the special inquiry officer reduced the amount of the bonds to $500 per alien. At that time there was no discussion of the condition against accepting unauthorized employment. The District Director thereupon prepared new bonds which again contained the condition against employment. At the request of counsel, the special inquiry officer reopened the bond proceedings and, over objection of the District Director, deleted the condition. It is that action which the District Director asks us to review on this appeal.

Counsel claims that releasing the respondents on bond but making their further engagement in unauthorized employment subject to the penalty of having their bond forfeited works to defeat their right to appeal. In view of the result we reach, we need not respond to this contention of counsel.

We have been advised that bond has been posted and the respondents have been released, accepting the condition imposed

by the District Director under protest. We understand the Service has agreed that the respondents' right to challenge the contested bond condition shall not be prejudiced by their release. We shall decide this appeal on that basis.

This appeal raises two main issues. The first question is whether, in the present case, the District Director's use of a condition against unauthorized employment in a bond required of aliens in deportation proceedings is reasonable and proper. The second issue is whether the special inquiry officer, and thus indirectly this Board, has the power to review the District Director's action in these cases. We shall deal with the jurisdictional question first.

The District Director takes the position that the special inquiry officer had no authority to delete the condition relating to unauthorized employment because the District Director has the *exclusive* right to impose conditions of bonds other than the actual amount of the bond. The District Director relies upon a comparison of the language of 8 CFR 242.2(a), which recites his powers, and 8 CFR 242.2(b), which deals with the powers of the special inquiry officer to redetermine bond matters. The relevant portion of 8 CFR 242.2(a) reads as follows:

> When a warrant of arrest is served under this part, the respondent ... shall ... be informed whether he is to be continued in custody, or, if release from custody has been authorized, of *the amount and conditions of the bond* or the conditions under which he may be released. (Emphasis supplied.)

The relevant portion of 8 CFR 242.2(b), on the other hand, at first glance seems to limit the special inquiry officer to "determine whether a respondent shall be released under bond, and the *amount* thereof." (Emphasis supplied.) The District Director would have us interpret the absence of any reference to *conditions* of bond in 8 CFR 242.2(b) to mean that the special inquiry officer is without any power to review a determination as to non-monetary conditions of a bond made by the District Director.

We are unable to accept what we believe to be an overly mechanical interpretation of the regulations on the part of the District Director. As a general rule, all related regulations ought to be read together to form an integrated whole. With regard to the present appeal, this means that we should consider certain additional language contained in 8 CFR 242.2(a) which bears upon the issue at hand, but which was not mentioned by the District Director. We refer to the portion that states the District Director shall advise a respondent "whether he may apply to a special inquiry officer pursuant to paragraph (b) of this section for release or *modification of the conditions of release* ..." (Emphasis supplied.) When this additional language is considered it becomes

clear that the failure to mention the power to modify non-monetary bond conditions in the enumeration of the special inquiry officer's powers in 8 CFR 242.2(b) was not meant to deprive the special inquiry officer of that power. We do not deem it significant that 8 CFR 242.2(b) is given the heading "Authority of special inquiry officers; appeals." The authority of the District Director is spelled out in 8 CFR 242.2(a), but that section is merely entitled "Warrant of arrest."

Prior to 1954, this Board did not have authority to review bond determinations of the District Director. In that year, the Attorney General by regulation conferred appellate jurisdiction on the Board to review Service determinations relating to an alien's bond, parole or detention in deportation proceedings. The grant of authority now appears in 8 CFR 3.1(b)(7). The special inquiry officer had no authority, prior to 1969, to review bond determinations made by the District Director. In that year, however, the regulation was amended to give the special inquiry officer such authority. We discussed at length, in *Matter of Kwun*, Interim Decision No. 2021 (BIA 1969, 1970), the fact that the purpose of the amendment to the regulations, and the simultaneous expansion of the jurisdiction of the special inquiry officers, was to eliminate the need for direct appeals to the Board from bond, parole or detention determinations of the District Director. We therefore agree with the special inquiry officer's ruling that he does in fact have the power to review and modify the conditions of a bond imposed by the District Director. This Board, by virtue of 8 CFR 3.1(b)(7), then, has the power to review the special inquiry officer's consideration of the initial determination made by the District Director in the present case. We believe this result comports with the basic principles underlying the 1954 and 1969 changes in the regulations.

The next question is whether the District Director's use of the condition against unauthorized employment, pending a final determination as to deportability, is reasonable and proper. We do not agree with the Service that the condition here imposed by the District Director is a proper one. We are in accord with the decision of the special inquiry officer in eliminating that condition and we shall dismiss the Service appeal from his order.

The statutory authority regarding requiring a bond *pending* final determination as to deportability is contained in section 242(a) of the Immigration and Nationality Act. The relevant portion of that section reads as follows:

Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Any such alien taken into

custody may, in the discretion of the Attorney General and pending such final determination of deportability, (1) be continued in custody; or (2) be released upon bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; ...

The District Director takes the position that the special condition placed in the bonds of the respondents declaring that unauthorized employment would constitute a breach of the bonds is permissible under the broad power given the Attorney General in section 242(a) of the Act. The District Director notes that the procedure for advance approval by the Regional Commissioner of riders containing special conditions not found on the standard bond form set forth in 8 CFR 103.6(a)(2) was followed. The District Director apparently rests upon 8 CFR 242.2(a) as authority that the Attorney General's broad power has been delegated to him.

The special inquiry officer, in cancelling the bond condition prohibiting unauthorized employment, rejected the position of the District Director. In essence, the special inquiry officer held that no one has the power to impose such a condition in a bond in a deportation proceeding. The position of the special inquiry officer is set forth on page 17 of the transcript. It reads as follows:

I have always viewed the bond where an alien is under deportation proceedings as a bond which would assure his appearance and delivery. The conditions that the District Director can impose on that would be such conditions which will influence his appearance. The purpose of a bond is to assure his appearance and the necessity of the bond also is if he is likely to abscond or if he is a threat to the public safety or security of the United States.

The statute prescribes no limitation on the nature of the conditions which may be imposed. In view of the broad grant of power, it seems to us that any *reasonable* condition formulated by the District Director as the delegate of the Attorney General must be sustained. In determining what is reasonable, we must of course take into account the gloss which this provision has acquired in the courts through the years.

While it is a bond condition which in form confronts us, in reality the issue directly involves detention. If the respondents refuse to agree to the condition laid down by the District Director, i.e., that they shall not accept employment unauthorized by him, they will simply be continued in custody until the adjudication of their deportability becomes final and they can be deported.

The detention, bond, parole, and supervision provision of section 242 of the Act were designed primarily to make sure that the alien who is the subject of the deportation proceedings will be made available for hearing when required and for deportation if ultimately found to be deportable. If the alien's recent activities are

such as to constitute a menace to the internal security of the United States, he may properly be detained, *Carlson* v. *Landon*, 342 U.S. 524 (1952) (active membership in Communist Party during period of tension). Similarly, if by reason of criminal background or other adverse factors he is a bad bail risk, he may be held to high bail or detained without bail, *Hernandez-Avila* v. *Boyd*, 294 F.2d 373 (C.A. 9, 1961). In the absence of any security risk or bail risk elements or any meaningful criminal record, an alien should ordinarily not be detained, *Rubinstein* v. *Brownell*, 206 F.2d 449 (D.C. 1953), affirmed by an equally divided court, *Brownell* v. *Rubinstein*, 346 U.S. 929 (1954).

We agree that $500 bond is a reasonable requirement in these cases. There is nothing in the record before us, however, to indicate that any of the respondents is a security risk or has a meaningful criminal background. The Service candidly concedes that the use of the "no unauthorized employment" condition in an appearance and delivery bond to secure the release of an alien in deportation proceedings is novel.[1] It attempts to justify the imposition of this condition on the peculiar factual situation presented in the cases of these respondents by the following chain of facts and reasons:

The respondents, as aliens concededly deportable, have no legal right to remain. It is unlawful for them to work here. Worse, their employment by California Originals at the minimum wage permissible by law deprives American workers of employment, since the latter cannot work for such substandard wages. This in turn contributes to unemployment. The situation is aggravated by the fact that California Originals has a high proportion of illegal aliens among its employees, is uncooperative, and is under investigation for harboring aliens. The Service assures us that the District Director does not intend to use the "no unauthorized employment" condition indiscriminately in the cases of all aliens here illegally, but only on a carefully selective basis.

Underlying this proposal is the thesis that detention is warranted (over and beyond its obvious use to make the alien available for hearing and for deportation) not only to meet the needs of internal security but also to meet the possible needs of economic security. In other words, if aliens here illegally are holding down jobs that Americans could use, the aliens may be placed in detention so that their jobs will become available for the

---

[1] Such a condition is usually found in a maintenance of status and departure bond, which is sometimes exacted of aliens seeking to enter the United States as nonimmigrants for a temporary period and as to whose bona fides there may be some lingering doubt.

Americans. Even if this were considered a desirable way of attacking the problem, we believe it is an impermissible use of the detention power.

The respondents entered the United States in a status which did not permit them to work here, so that it was and is unlawful for them to accept gainful employment. See *Londono* v. *INS*, 433 F.2d 635 (C.A. 2, 1970). But so far as we can ascertain, deportation is the only sanction imposed by the statute for this infraction. We can find no statutory provision which makes it a crime for an alien here illegally to work for pay or which imposes a civil penalty other than deportation. The impact upon our economy of illegal immigrant employment has been the subject of intensive Congressional scrutiny in recent months and numerous bills specifically tailored to meet the problem have been introduced. One of them, H.R. 14831, 92nd Cong., 2d Sess., would amend section 274 of the Act to impose civil and criminal penalties, for successive violations, upon an employer who knowingly employs an alien not lawfully admitted for permanent residence unless such employment is authorized by the Attorney General.

Whether or not the acceptance of unauthorized employment by an alien here illegally should be a criminal offense is a matter of legislative judgment. If Congress were to make such conduct a criminal offense and such an alien were to be charged therewith, he would have to be found guilty after a due process trial and sentenced to imprisonment by a judge before he could be confined. We do not feel that the detention power conferred by section 242(a) of the Act should be used to achieve the same result while Congress is pondering what legislation to enact, merely because the District Director is impatient at the delay.[2]

The Service is not remediless. If it feels the respondents are using dilatory tactics in order to delay deportation so that they may continue to work here illegally as long as possible, this design can be thwarted by expediting procedures all along the line. Priority handling and prompt deportation, rather than preventive detention, is more in keeping with our traditions as a method of coping with this problem. We have expedited consideration of respondents' cases and our careful review of the records satisfies us that their appeals lack merit. We are therefore dismissing their

---

[2] Excerpt from District Director's memorandum dated August 7, 1972 to Service Representative, Board of Immigration Appeals:

"The ultimate question to be answered is whether the government has the authority to imaginatively utilize the weapons at hand to counter an immediate and present economic problem or sit idly by permitting the problem to destroy us while we await the creation of new weapons in the form of legislation and/or regulations."

appeals in separate orders today. Insofar as concerns the Service appeal in the bond proceedings before us, that, too, will be dismissed.

**ORDER:** The appeal is dismissed.

**Warren R. Torrington, Member, Dissenting:**

I must dissent; for the order of the Board seeks to impose an unreasonable limitation on the authority of the Attorney General to detain and release aliens pending a determination of their deportability.

I agree with the holding that, under the provisions of 8 CFR 242.2(b), a special inquiry officer has the authority to modify the conditions of a bond imposed by the District Director. I disagree with the holding that a condition that the deportable alien "not accept employment" is unreasonable, and with the order dismissing the Service appeal.

From the record the full text of the conditions of this bond with which we are here concerned appears to be as follows:

In consideration of the granting of the application of the above named alien for release from custody under a warrant of arrest issued by the Attorney General charging that he is unlawfully in the United States, provided there is furnished a suitable bond as authorized by Section 242 of the Immigration and Nationality Act, the obligor hereby furnishes such bond with the following conditions i.e.: If said alien is released from custody and if said alien does not accept employment in the United States on or after the effective date of this bond unless authorized by the Immigration and Nationality Service and if the above obligor shall cause said alien to be produced or to produce himself to an immigration officer of the United States upon each and every request of such officer until deportation proceedings in his case are finally terminated or until said alien is actually accepted by such immigration officer for detention or deportation, then this obligation shall be void; otherwise it shall immediately become due and payable; Provided, that it is hereby specifically agreed by the obligor that no order issued by or under the authority of the Attorney General by virtue of which issuance or execution of an order of deportation is or may be deferred, or by virtue of which the said alien is or may be permitted to depart voluntarily from the United States, shall be in any manner construed to impair or render void this obligation or any part thereof.

The majority opinion recognizes that section 242(a) of the Immigration and Nationality Act contains "no limitation on the nature of the conditions which may be imposed" in a bond. Indeed, the language of the statute is as clear as can be. The majority does not find the condition here sought to be imposed by the Service to be unconstitutional, illegal, or immoral. It emphasizes that the "respondents entered the United States in a status which did not permit them to work here, so that it was and is unlawful for them to accept gainful employment." It then expresses the strange view that a bond condition against unlawful employment is "unreasonable." I disagree.

The Immigration and Nationality Act does not, as the majority would have us believe, direct the Attorney General to stand idly by while aliens who, being represented by experienced immigration counsel, have admitted the truth of the allegations in the orders to show cause, and have conceded their deportability, flagrantly violate the immigration laws of the United States. On the contrary, Congress has, in no uncertain terms, given the Attorney General the unrestricted power to release, in his discretion, an alien arrested under section 242(a) of the Immigration and Nationality Act, pending a determination of the alien's deportability, "under bond in the amount of not less than $500 with security approved by the Attorney General *containing such conditions as the Attorney General may prescribe.*" [Emphasis supplied]. Incidentally, under section 242(a) of the Immigration and Nationality Act, the Attorney General has the option to continue an arrested alien in custody pending a determination of his deportability, and not to release him at all. It goes without saying that there must never be an abuse of the Attorney General's discretion. The statute provides for review or revision of a determination of the Attorney General by a court of competent jurisdiction only "upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability."

The majority is careful not to state that the imposition of the condition against the taking of employment constituted an abuse of the Attorney General's discretion. Only a clear abuse of discretion would justify the setting aside of an otherwise legal condition. The condition here sought to be imposed was not only not unreasonable, but, in my opinion, was eminently reasonable and proper. I reject the strange notion advanced in the majority opinion that the chief law enforcement officer of the United States, acting through the Immigration and Naturalization Service, has no authority in any case to attempt to prevent admittedly deportable aliens from thumbing their noses at the immigration laws of this country unless violations of such laws call for criminal sanctions.

The cases cited on page 8 of the majority opinion have no relation to the issue that is before us. That issue is simply whether the condition here sought to be imposed is reasonable or not.

The case of *Carlson* v. *Landon*, 342 U.S. 524 (1952) dealt *only* with the question whether the Attorney General could continue active alien Communists in custody, *without bail*, pending determination of their deportability, under section 23 of the Internal

531

Security Act of 1950 (8 U.S.C. § 156). Similarly, the decision of the United States Court of Appeals for the Ninth Circuit in *Hernandez-Avila* v. *Boyd*, 294 F.2d 373 (C.A. 9, 1961) has no conceivable relation to the question here involved. There the Court held that a determination of the Attorney General and his authorized representative with respect to bail would be overturned only if there was an abuse of discretion. The Court did not find an abuse of discretion.

The majority opinion cites a decision of the United States Court of Appeals for the District of Columbia Circuit in the interesting case of *Rubinstein* v. *Brownell*, 206 F.2d 449 (D.C. 1953), affirmed *sub nom. Brownell* v. *Rubinstein*, 346 U.S. 929 (1954), as supporting the following proposition: "In the absence of any security risk or bail risk elements, or any meaningful criminal record, an alien should ordinarily not be detained." That decision not only does not support the foregoing proposition at all, but deals with an entirely different situation. Rubinstein *had* indeed *been released* on bond. He then brought a suit against the Attorney General for declaratory relief with regard to an administratively final deportation order and for an injunction restraining the Attorney General from arresting Rubinstein. He (Rubinstein) asserted that the Attorney General had threatened to take him into custody. The—divided—court stressed the fact that it had not been denied by the Government that Rubinstein would not engage in reprehensible activities, and remanded the case to the District Court with directions to issue a preliminary injunction restraining the Attorney General from *revoking* Rubinstein's bail and taking him into custody.

Some comment is required with regard to certain unfortunate expressions and unsubstantiated theories which appear in the majority opinion. One of them is the deliberate and wholly unwarranted use of the term "preventive detention," with its well-known connotation. The respondents—who, incidentally, posted the bonds including the condition not to accept illegal employment, and were released thereafter—were never held in "preventive detention," but successfully frustrated the efforts of the Service to deport them when, having admitted the truth of the allegations in the orders to show cause, and having conceded their deportability, they took appeals to this Board from the orders of the special inquiry officer finding them deportable. Those appeals have now been dismissed by us.—The concomitant reference to our "traditions," which follows the characterization of the retention in custody of the respondents as "preventive detention," is equally misplaced. Observing the laws Congress has enacted is, I respectfully maintain, "more in keeping with our traditions" than permit-

ting aliens illegally in this country to violate them, a consequence of the conclusions reached by the majority.

The admonition to expedite "procedures all along the line" is paticularly inappropriate in an order which would make it possible for aliens illegally in this country to engage in renewed violations of our immigration laws. Inasmuch as "dilatory tactics" employed by aliens consist of appeals to this Board and of proceedings instituted in the federal courts, there is precious little the Service can do to expedite "procedures." As everyone who even casually reads a daily newspaper knows, the Service has already been doing its utmost to effect speedy deportation of aliens illegally in this country, but is being overwhelmed by the enormity of the problem. With hundreds of thousands of aliens already illegally in this country, and their numbers growing, the present lawful efforts of the Immigration and Naturalization Service, acting for the Attorney General, to enforce compliance with the immigration laws of the United States should be encouraged, and not hampered, by this Board to which the Attorney General has entrusted certain of his powers of review. The pious statement in the last paragraph of the majority opinion that, "The Service is not remediless," illustrates the type of ivory-tower approach which we should avoid.

There is no merit to counsel's novel contention that these admittedly deportable aliens are entitled to engage in unlawful employment while they proceed with appeals or pursue collateral matters.

Under the provisions of 8 CFR 3.1(h)(1)(ii), decisions of the Board are to be referred to the Attorney General for review if a majority of the Board or the Chairman believes that such a referral should be made. In the present case the Chairman and two Board members who have espoused the majority opinion have--in my view, regrettably--declined to refer this important three-to-two decision of the Board to the Attorney General for review. However, as in all cases, a review of the present Board decision by the Attorney General will take place, without the concurrence of the Chairman or the majority of the Board, if the Commissioner of the Immigration and Naturalization Service requests that the case be referred to the Attorney General for review, or if the Attorney General himself directs the Board to refer the case to him. 8 CFR 3.1(h)(1)(i) and (iii). I feel duty-bound to urge respectfully that that be done.

The Service appeal should have been sustained.

Marianne B. McConnaughey, Member, Dissenting:

I agree with the majority decision on the jurisdictional issues. The statute, section 242(a) [8 U.S.C.A. 1252(a)], gives the Attorney

General broad power with regard to detaining and releasing aliens who are involved in deportation proceedings.

I agree with the majority decision that the District Director had the authority to impose a condition in allowing the respondents release on bond. The Special Inquiry Officer, quoting from 8 CFR 242.2, reversed the District Director and lifted the condition, giving as his reasons that the District Director did not have the authority to impose the condition, and that a bond is only to guarantee an appearance. I agree that the Special Inquiry Officer has authority to set aside the condition imposed by the District Director. The District Director is mistaken in asserting that the right to impose the condition resides in him with no review by the Special Inquiry Officer.

Even though the regulations delegating the Attorney General's power are not as clear as we might wish, the procedure is not unworkable even in this rather difficult situation. The Special Inquiry Officer has authority to overrule the District Director, to lift the condition imposed or to change conditions, and the Board has jurisdiction to review the matter.

Under the regulations the Board has authority to review bond matters. 8 CFR 3.1(b)(7) provides that the appellate jurisdiction of the Board shall include appeals from "determinations relating to bond, parole, or detention of an alien as provided in part 242 of this chapter." Therefore bond conditions imposed by a District Director, approved by a Regional Commissioner, and adjudicated by a special inquiry officer are appealable to the Board. 8 CFR 242.2(a) and (b) also provide for review by the Board. This is the usual, customary, orderly manner of proceeding, with the Board performing its proper function as a buffer and intermediary between the Service and the courts.

The majority decision states, "The statute prescribes no limitations on the nature of the conditions which may be imposed. In view of the broad grant of power, it seems to us that any *reasonable* condition formulated by the District Director as the delegate of the Attorney General must be sustained. In determining what is reasonable, we must of course take into account the gloss which this provision has acquired in the courts through the years."

Section 242(a) is quoted only in part in the majority decision. However, the statute continues:

... But such bond or parole, whether heretofore or hereafter authorized, may be revoked at any time by the Attorney General, in his discretion, and the alien may be returned to custody under the warrant which initiated the proceedings against him and detained until final determination of his deportability.

534

Since it is conceded that "any *reasonable* condition formulated ... must be sustained," the majority necessarily concluded that the condition with which we are concerned here was not reasonable. First, the condition formulated by the District Director seems to me to be eminently reasonable. Second, I have been unable to discover that the law and regulations have acquired much interpretive "gloss." We have few bond appeals; the use of bonds by the Service seems to have worked smoothly and been acceptable. The very fact that these cases are here on a fairly fundamental or primitive issue indicates a certain lack of "gloss."

It is true that there have been in use two kinds of bonds: first, appearance bonds and, second, maintenance of status bonds. It has long been permissible also to include in bonds either *maintenance* of or *continuance* of status provisions, or departure provisions. Bonds serve a variety of purposes. Occasionally the Service may require that an alien or a parolee remain in a specific area. An alien in the United States on a student visa may be found out of school or employed without permission of the Service. He may be required to post a bond as a condition of his being permitted to remain and to return to school. This is not a unique situation, as everyone knows who works in this area. An arriving "visitor" who has no return ticket and no money may be delayed at the port of entry until a friend or relative posts a bond to guarantee that the new arrival does not obtain employment and does depart at the expiration of his visit. This is a standard procedure.

It seems to me that under the regulations the District Director could require a bond containing maintenance of status provisions, and the Special Inquiry Officer could, in his turn, require an appearance bond. This would be onerous and unnecessary and to my knowledge is not done. But if this is true, there would seem to be no reason why one $500. bond should not serve both purposes.

The regulations recognize that standard forms cannot cover every situation that may arise. 8 CFR 103.6(a)(1) and (2) gives the District Director, with advance approval by the Regional Commissioner, the power to devise new provisions to be used as riders when necessary. The fact that the rider used in this case constitutes a departure does not mean it is illegal or improper.

There is no claim here that any of the respondents have legal status or eligibility for any relief from deportation except to apply for a grant of voluntary authority as a matter of administrative discretion. Deportability has been conceded by counsel, and found by the Special Inquiry Officer. We are today dismissing the appeals from the orders of the Special Inquiry Officer. Counsel claims the respondents have a "constitutional right to work." No one questions that an alien with a (limited) right to remain

535

becomes deportable and forfeits his status for accepting unauthorized employment. The visitor who enters in legal status with documents and a hearing before a Service officer does not enjoy the right to take a job as soon as he is out of sight of the Service officer. Is it reasonable to say that respondents who have no status and no right to remain are free to accept any employment they choose? They claim the right to seek employment, unhampered by the immigration authorities. How did they who are here in defiance of law from the time they step over the boundary, acquire the constitutional right to work and to be free of a maintenance of status bond? The logic of this position escapes me. Most important, if the law and the regulations permit the Attorney General and his representatives to detain, to release, to parole and to rearrest pending deportation, how can it be impermissible for him to release on a bond containing a condition such as this, a quite *reasonable* condition under the circumstances?

The majority decision states that it is not a crime for an illegal alien to work, that they have been convicted of nothing, and therefore it is wrong to detain them. Illegal entry and reentry without permission following deportation are both crimes under sections 275 and 276 of the Immigration and Nationality Act. There are no prosecutions, as yet, in these cases, and probably there will be none. Some of the respondents were granted voluntary departure by the special inquiry officer as a matter of administrative discretion. Others, who admitted two, four and six illegal entries, or entries following deportation, or payment to smugglers to achieve entry, were ordered deported.

The majority attempts to equate this bond condition with a sentence to jail for commission of a crime. This is not a valid equation. The aliens were to be released to go their way upon posting a bond containing two conditions—that they make themselves available for hearing when they were called, and that they refrain from accepting unauthorized employment. The latter condition does not differentiate them from all other aliens in the United States without status. They were not sentenced to detention. In this case it was counsel's choice not to post the bond. The original agreement to post bond has been discussed. It is not reaching too far outside the record to note that four days after oral argument the bond containing the condition was posted, and the respondents were released. At oral argument the appellate trial attorney was asked whether the Service would deny respondents employment by some other employer while they pursue their right to appeal from the orders of deportation. (Page 27, oral argument). The appellate trial attorney answered, "Probably not."

Congress has attempted since the early part of this century, as

part of its various plans to assure orderly immigration, several programs such as job assurances, sponsors, preferences, and now there is an elaborate system of job certifications and exemptions. These provisions are and have been administered through the Departments of Labor, State and Justice, attempting to act cooperatively. The laws have changed as our needs changed, and as the position of the United States in the world economy changed.

It was claimed by counsel that California Originals needs these particular skilled aliens in order to conduct its business, and that the Service denied the company's petition to have them admitted as industrial trainees. Counsel maintained that because the company needs them, and because they want to work, the bond condition is wrong. The Service expressed concern that respondents hold jobs that should be made available to citizens and legal residents. I am not particularly concerned about "saving" these few jobs for the American worker. I would lay aside the economic-political factors which consumed much of the time on both sides during oral argument. The case before us concerns an employer and a group of aliens illegally in the United States who have knowingly and defiantly and repeatedly violated the law, and who intend to continue to do so for as long as possible. At least some have been deported repeatedly and have returned to the same employment. I find this new bond condition an interesting development of an enforcement technique, already authorized by the law, at a time when the Service desperately needs new enforcement techniques. The snowballing problems facing the Service are well known. It has been widely said that taking the profit out of illegal entry, both for the aliens and the employers, is the only real way to discourage repeated illegal border jumping.

Counsel asserted that this is a case of first instance or a "pilot case," that it represents a new policy, that if we permit the Service to impose this no-work condition the Immigration Service will exact a similar bond from every alien arrested inside the United States. The appellate trial attorney denied that the Service has such an intention. He stated that the result of such action would be great hardship, that large numbers of dependents would be forced onto relief rolls pending processing of immigration cases, and that this is not what the Service wants.

Review jurisdiction is with us in every case, as well as in the courts. I do not fear that the District Director would use this power casually or capriciously. If we sustain the bond requirement, the alien may then pursue his remedy in court. We would expect the District Director to use this power sparingly, recognizing that he may not act capriciously.

To recapitulate: The Attorney General has the authority to

order a bond containing a reasonable condition and in an amount reasonable under the circumstances of the case. Maintenance of status provisions in bonds are not new; only the use of them in this particular situation is new. There are provisions in the regulations for new kinds of bond conditions in the form of "riders." There appears to be no reason why two separate bonds could not have been required, but a single bond serving a double purpose is more efficient. Detention can be used for purposes other than as punishment for commission of a crime; respondents were asked only to refrain from accepting unauthorized employment and were released when the required bond was posted. The condition ordered here was a proper condition. I would reverse the special inquiry officer's order and approve the District Director's imposition of the bond condition.

## BEFORE THE BOARD
### (April 6, 1973)

This matter is before us on a Service motion for reconsideration of our order dated September 7, 1972. That order dismissed the Service's appeal from a special inquiry officer's decision striking from respondents' appearance and delivery bonds a condition against acceptance of unauthorized employment. We adhere to our order of September 7, 1972 and deny the motion for reconsideration.

The facts have been fully stated in our prior order and need not be repeated at length. Respondents are all aliens, natives and citizens of Mexico, employed by a ceramics manufacturer, California Originals of Torrance, California. All had previously worked for the same employer while here illegally and, after leaving the United States, had returned here illegally with the intention of resuming their jobs. Deportation proceedings were started, they were arrested, and their release from custody was ultimately authorized on posting of a $500 appearance and delivery bond by each. The District Director had inserted in each bond an additional condition against acceptance of employment not authorized by the Service. This condition was admittedly designed to prevent their further employment by California Originals. On their request for a redetermination, the special inquiry officer deleted the condition against unauthorized employment. The District Director appealed to this Board from the special inquiry officer's decision, execution of which was stayed pending appeal. Under protest, the respondents posted bond containing the questioned condition and were released, it being agreed that their right to challenge the contested bond condition should not be prejudiced by their release.

They promptly returned to their employment with California Originals.

In our order of September 7, 1972, we dismissed the Service appeal.[1] We unanimously rejected the Service contention that the District Director's exaction of the challenged bond condition was not subject to review by the special inquiry officer or by this Board on appeal. By a divided vote, we concluded that in this setting, the exaction of such a condition is impermissible.

In its motion for reconsideration, the Service no longer questions the power of the special inquiry officer or this Board to review the District Director's bond determination in all respects. It argues strongly against the position taken by the majority of this Board that the bond condition here imposed is unreasonable.

Preliminarily, the Service questions our definition of the issue. In our opinion of September 7, 1972, we stated (at p. 8):

> While it is a bond condition which in form confronts us, in reality the issue directly involves detention. If the respondents refuse to agree to the condition laid down by the District Director, i.e., that they shall not accept employment unauthorized by him, they will simply be continued in custody until the adjudication of their deportability becomes final and they can be deported.

After analyzing the reported decisions relating to detention of aliens, we then proceeded to hold that the "no unauthorized employment" provision cannot in this setting be exacted as a condition of the respondents' release from detention in deportation proceedings.

Detention, argues the Service, is not directly involved. "The penalty is not detention in the event of a violation of the bond, but the loss of the $500" (Motion for Reconsideration, p. 7).[2] The Service points to the new and broad language of the power conferred in section 242(a) of the Immigration and Nationality Act, which permits release under bond "containing such conditions as the

---

[1] On the same day, we dismissed the respondents' appeals from the orders entered in the deportation proceedings, finding them to be deportable. Petitions for review of our orders in the deportation proceedings were later filed under section 106(a) of the Immigration and Nationality Act in the United States Court of Appeals for the Ninth Circuit. We are informed that on January 2, 1973 the petitions for review were dismissed.

[2] See also Service Memorandum in Opposition to Brief Amicus Curiae, page 5: "The brief *amicus curiae* is premised in large part on the erroneous assumption that 'bond conditions' and 'custody' are necessarily synonymous. The purpose of the bond condition, in this instance, is to act as a deterrent to continued acts in flagrant violation of the immigration laws. The threat of forfeiture of the bond is a deterrent. Custody is something else. Even if the bond is breached, it by no means follows that confinement is desirable or indicated, or will necessarily take place. That decision, too, must rest in the sound discretion of the District Director, based on a new and different set of considerations."

Attorney General may prescribe." It is the Service position that the decisions arising under the former statute and those dealing solely with custody do not supply the proper standards to measure the validity of the bond conditions newly authorized by the 1952 Act (Service Memorandum in Opposition to Brief Amicus Curiae, pages 2-5).

Such a simplistic approach ignores the realities of the situation. It seems clear to us that detention permeates every bond such as those here involved. A bond is merely an undertaking by the obligor that he will perform the conditions specified or pay the stipulated penal sum. But before any such undertaking, containing any conditions, can be exacted, there must be some leverage which can be applied to the obligor to induce him to become thus bound. In this case, it is detention which supplies the leverage.

In the case of an alien applying for admission to the United States as a nonimmigrant, if there is doubt as to whether he will maintain his status once admitted, a maintenance of status and departure bond can be exacted as a condition of his admission. If he fails to post the bond, he is excluded from admission. The threat of exclusion is the leverage which induces such an alien to post bond.

In the case of an alien admitted to the United States as a nonimmigrant who applies for an extension of stay, if there is doubt as to whether he will continue to maintain his nonimmigrant status, a maintenance of status and departure bond can be exacted as a condition of the grant of an extension of stay. If he fails to post the bond, the extension of stay is denied and he must depart or face deportation proceedings. The threat of denial of the extension of stay is the leverage which induces such an alien to post bond.

In deportation proceedings brought against an alien already within the United States, arrest and temporary custody of the alien are no longer required in every case. Section 242(a) of the Act now provides that, pending determination of deportability "such alien *may*, upon warrant of the Attorney General, be arrested and taken into custody." (Emphasis added.) Most deportation proceedings now are started by the issuance of an Order to Show Cause alone, without the issuance of a warrant of arrest. It is only where the alien is arrested that the ensuing provisions of section 242(a) come into play. The statute continues:

> ... Any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (1) be continued in custody; or (2) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (3) be released on conditional parole. ...

Thus, the bond posted by a detained alien, whatever its condtions, is an alternative to detention. Unless released on bond or conditional parole, the alien is continued in custody. Where the power to detain ceases by time limitation, as is the case under section 242(d) of the Act, the power to require bond as a condition of enlargement ceases, too, *Schrode* v. *Rowoldt*, 213 F.2d 810 (C.A. 8, 1954). Thus, it is the power to detain, coupled with the threat of detention, which is the leverage which induces an alien in deportation proceedings to post bond.

That the bond may contain discrete conditions (including the one here in question, having nothing to do with the alien's availability for hearing or deportation) does not alter the fact that, unless the alien is willing to bind himself to each of the required conditions, he will not gain release from detention. It is immaterial that the Service may, on breach of the condition, be content to collect the penal sum and refrain from once more taking the alien into custody (see footnote 2, supra). What concerns us here is the power of the Service to exact such a commitment as a condition of release in the first place, not what action the Service may or may not take once the commitment has been violated. The respondents posted bond containing the contested condition and gained their release, but this was solely on the agreement that they would not thereby prejudice their challenge on appeal to the lawfulness of that condition. Had there been no such agreement and had the aliens remained in custody, could there be any doubt that the condition insisted on by the District Director would have been directly related to their detention? We adhere to the view that the issue before us directly involves the power to detain and that the considerations governing release from detention apply.

In short, we reject the notion that when the District Director exercises the Attorney General's delegated power to prescribe bond conditions conferred by section 242(a) of the Act, he is not simultaneously involved in a direct application of the detention power conveyed by the same provision. The court decisions cited in our original opinion, which discuss the factors pertinent to the detention of aliens in deportation proceedings, are clearly germane.[3]

---

[3] Admittedly, no court has thus far dealt with the precise bond condition now before us, for its use by the Service is concededly novel. At the same time, we are entitled to consider what the courts have said generally on the subject in dealing with questions of enlargement from Service custody and similar issues. See, e.g., *Leng May Ma* v. *Barber*, 357 U.S. 185, 190 (1958): "Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond ... Certainly this policy reflects the

The provisions of section 242 of the Act relating to the arrest, release, and supervision of aliens in deportation proceedings were designed primarily to see to the alien's continued availability for hearing when required and for deportation if found deportable. The provision authorizing bond "containing such conditions as the Attorney General may prescribe," while stated in general terms, must be read in the context of the statutory scheme. Cf. *United States* v. *Witkovich*, 353 U.S. 194 (1957).

For purposes of this decision, we need not define in legal terms the nature of respondents' employment opportunities pending their actual deportation. At oral argument (Tr. p. 12 et seq), counsel for the respondents argued that every alien in the United States, even an alien here unlawfully, has a constitutionally protected right to earn a living, i.e., to hold down a job. We need not pause to consider whether the respondents' undoubted power, if unmolested, to maintain their positions with California Originals is properly classifiable as a right, a privilege, or merely an illicit opportunity. While their continued employment may be unlawful in the sense that it violates the policies of our immigration laws, the fact remains that no law now on the books makes it a crime for them to be thus employed. The only civil sanction for such unauthorized employment is deportation. Since the respondents are already deportable on other grounds, their continued employment until such time as they are actually deported, however unlawful such employment may be, does not make them any more deportable than they already are.

In seeking to justify in a deportation context this new bond condition against unauthorized employment, the Service emphasizes the deterrent effect of the monetary forfeiture provision and disavows any general Service policy of rearresting the recalcitrant alien who violates the condition once released. We fail to see how such forebearance is pertinent to the issue before us. If, as we have held, the imposition of this bond condition is impermissible as a prerequisite to release from detention in the first place, it receives no added sanction by the Service's representation that it will refrain from rearresting the alien if on release he breaches the impermissible condition.

Moreover, unless to the threat of monetary loss in the event of breach there is added the threat of renewed detention, this new bond condition becomes in effect a mere licensing provision, the exaction of a fee from those aliens (or their employers) willing to

---

humane qualities of an enlightened civilization;" *United States* v. *Wong Kim Bo*, 466 F.2d 1298, 1304 (C.A. 5, 1972): "Its [arrest's] sole function is a security device to assure that the alien does not evaporate."

pay it, for what amounts to a license to work here illegally until deported. To be truly effective as a deterrent, the penal amount of the bond would have to be raised to a figure sufficiently high to make a forfeiture really painful. But the fixing of such high bail could readily preclude the alien from raising the required amount and thus prevent his release from detention in the first place, a result which the Service says it does not seek.[4]

In arguing for the power to impose the work-prohibition condition here in issue, the Service disavows any intention of using that power extensively and indiscriminately, stating that "its actual use would be confined to a flagrant violation such as we have here" (Motion for Reconsideration, p. 8). Essentially, it is the fact that the respondents work for California Originals that is crucial; if they worked illegally for some other employer the same bond condition would probably not be imposed (Tr. of oral argument, p. 27). If the imposition of this bond condition is impermissible against deportable aliens generally, then its use against respondents because they work for California Originals constitutes, in effect, a Service attempt to use their detention as leverage against their employer. In our view, the use of the detention power in order to reach an employer who has displeased the Service is equally impermissible.

The Service attempts to equate the bond condition here involved with the maintenance of status provisions of bonds authorized in the cases of applicants for admission as nonimmigrants or for extension of nonimmigrant stay. "Since aliens are admitted to the United States with a restriction mandated by the Congress against their taking unauthorized employment, it is not seen why the same restriction is unreasonable when applied to a bond for a deportable alien who would clearly [have been] excludable at time of admission if his intent to accept employment were known" (Motion for Reconsideration, p. 12). The short answer is that, as the Service recognized at oral argument (Tr. p. 27), a deportable alien is out of status and no longer has a lawful status which the bond provision can induce him to maintain. Different considerations are involved in the cases of nonimmigrant applicants who are in lawful status and in the cases of deportable aliens who have allegedly lost their right to remain here lawfully. In the case of the latter, as we have seen, the bond condition in question is not a guarantor that they will maintain their lawful status but an impingement on their release from detention while their deportability is in process of adjudication. If the condition sought to be

---

[4] Motion for Reconsideration, p. 7: "The Service does not seek the aliens' detention. It wishes them released, for their sake and to minimize further expense to the government, if for no other reasons . . ."

imposed is an impermissible one, it is no answer to suggest that, in any event, "review jurisdiction is with the Board and the courts" (Motion for Reconsideration, p. 9).

In our original decision, we suggested that expedited deportation, rather than detention, is the way to thwart illegal employment by deportable aliens. In its Motion for Reconsideration (p. 15) the Service challenges our suggestion, asserting that "frivolous and dilatory appeals, and the inescapable strictures of overloaded court calendars, tend to make this remedy [expeditious forcible expulsion] more illusory than meaningful." If existing procedures have flaws which open the door to delay, then it seems to us that the proper way to deal with the situation is to revise and refine the procedures. The use of detention as leverage to discourage delay which existing procedures may make possible is not, in our view, a permissible way to cope with the problem, *Matter of Au*, Interim Decision No. 1939 (BIA 1968); *Matter of Kwun*, Interim Decision No. 2021 (BIA 1969, 1970).

ORDER: The motion for reconsideration is denied.

Warren R. Torrington, Member, Dissenting:

In my previous dissenting opinion, I stated the following: "The cases cited on page 8 of the majority opinion have no relation to the issue that is before us. That issue is simply whether the condition here sought to be imposed is reasonable or not." In its opinion of September 7, 1972, the majority had declared the bond condition against unlawful employment to be "unreasonable," although it could not find any authorities supporting its holding which contravenes the clear provisions of section 242(a) of the Immigration and Nationality Act.

As the new opinion which denies the Service's motion for reconsideration reveals, the majority has still found nothing to support its thesis that an alien who, under the applicable law, must be deported, has, by the very fact of his previous violations of our laws and his ensuing deportability, gained the right further to violate the laws of the United States until he is actually deported. I have to disassociate myself from that kind of illogical and tortured reasoning.

While the verbiage employed in the new majority opinion appears to have little relation to the issue, and merely tends to obscure it, it does constitute a belated attempt to provide some underpinning for the original majority opinion's theories, and therefore cannot be passed over without comment.

1. Although it speaks of "the realities of the situation," the majority opinion continues its ivory-tower approach to the facts and the law. Instead of addressing itself to the issue, it talks about

aliens applying for admission to the United States as nonimmigrants and about aliens applying for extensions of stay, and reports its discovery that such aliens do indeed post bonds requiring them to abide by the laws of our country. That is nothing new; and it has, of course, nothing to do with the issue. The issue is not the application of a newly invented theory of "leverages," but simply whether the statute (section 242(a) of the Immigration and Nationality Act) denies to the Attorney General the power to require deportable aliens not to continue previous violations of our laws. It does no such thing.

2. As I pointed out in my previous dissent, the majority has not gone so far as to maintain that a bond condition against unlawful employment is unconstitutional, illegal, or immoral. It has merely attempted to misconstrue a clear provision of the statute which needs no construction. It has stated that, "We need not pause to consider whether the respondents' undoubted power, if unmolested, to maintain their positions with Califrnia Originals is properly classifiable as a right, a privilege, or merely an illicit opportunity." It would have been refreshing if the majority had indeed "paused" to state, in straightforward language, the rather elementary principle that a nonimmigrant alien has no right whatsoever to engage in unauthorized employment at any stage of his stay in the United States. The majority's refusal to "define in legal terms the nature of respondents' employment opportunities pending their actual deportation" (as the majority opinion puts it) reveals an astounding indifference to that elementary principle. Even more objectionable is the majority opinion's use of loose language which regrettably and wrongly implies that the respondents' illegal employment just "may be" unlawful.

3. On page 9 of its opinion of September 7, 1972, the majority had stated that "The Service candidly concedes that the use of the 'no unauthorized employment' condition in an appearance and delivery bond to secure the release of an alien in deportation proceedings is novel." The present majority opinion again insists that the bond condition with which we are here concerned constitutes something "new." What the Service, through its appellate trial attorney, had stated at oral argument conducted through an experimental and unsatisfactory telephone hook-up on August 14, 1972, was quite different. There, in explanation of his answer to a leading question put to him by the writer of the majority opinions, the appellate trial attorney stated the following: "You are talking now about or in connection with an appearance bond after deportation proceedings, that narrow area. I would say yes, we have not gone this route, certainly not many times to my knowledge. . ." (Tr. of Oral Argument, page 24). The plain fact is that no survey

545

determining the frequency of the imposition of the bond condition here involved has ever been made. What is really "novel" is, however, the following:

a. The fact that, up to now, nobody had advanced the notion that, as I put it in my prior dissenting opinion, the Immigration and Nationality Act directs "the Attorney General to stand idly by while aliens who, being represented by experienced immigration counsel, have admitted the truth of the allegations in the orders to show cause, and have conceded their deportability, flagrantly violate the immigration laws of the United States;" and that a bond condition against unlawful employment is therefore "unreasonable."

b. The fact that only in recent years aliens have entered this country *illegally* by the hundreds of thousands.

c. The fact that, through employment of experienced immigration counsel, and through imaginative use of all conceivable administrative and other remedies, aliens illegally in this country are nowadays often managing to stay here for years.

d. The fact that the huge numbers of aliens now illegally in this country are taking away countless jobs from our citizens and from lawful permanent residents, and that their illegal employment tends to depress the wages that would normally be paid to American workers.

e. The fact that those aliens now illegally in this coutry who choose not to work collect welfare payments, and obtain free medical care at our hospitals, and that the children of illegal aliens obtain free schooling, all to the detriment of the American taxpayers.

f. The fact that the Service, with its limited personnel, can no longer cope with the tremendous illegal influx of aliens, and is attempting, through increased use of bond conditions like the one here under consideration, to make it less profitable for illegal aliens to engage in the prevalent whoesale violations of our immigration laws.

4. A number of undisputed and irrelevant facts are reported in the majority opinion as great revelations. It is quite true that, "Most deportation proceedings now are started by the issuance of an order to show cause alone, without the issuance of a warrant of arrest." So what? That simple question can also be asked with regard to the majority's statement that "detention permeates every bond such as those here involved." The issue before us was not, and is not, the manner in which deportation proceedings may be commenced, or the permeability or permeation of bonds, but simply whether the bond condition against unlawful employment, which the Attorney General, through the District Director, has

imposed on admittedly deportable aliens engaged in unlawful employment is so unreasonable that it cannot be imposed by him under the rather clear provisions of section 242(a) of the Immigration and Nationality Act.

5. In both the majority opinions and the dissenting opinions, we have discussed the matter before us in terms of the powers of the Attorney General under section 242(a) of the Immigration and Nationality Act. However, we must not forget that much more is involved. The Attorney General is the chief law enforcement officer of the United States. Thus, the views of the majority which have found expression in its unfortunate decision would be a major step toward preventing the United States from effectively protecting its people against continual wholesale violations of our most humane immigration laws.

6. I reject the majority's unjustified concern for admitted law breakers, and its underlying permissive ideology and views here expressed which, in my considered opinion, would go a long way toward frustrating the orderly and just administration of our immigration laws.

On reconsideration, the Board order of September 7, 1972, should have been withdrawn, and the Service appeal should have been sustained.

In my dissenting opinion of September 7, 1972, I reported that the majority had resolved not to accede to the request of the two dissenting Board Members that the Board's decision be referred to the Attorney General. On reconsideration of this matter, one of the members of the majority has now joined us in requesting that such a referral be made. Thus, the Board's decisions will have to be submitted to the Attorney General for his scrutiny and review, in compliance with the provisions of 8 CFR 3.1(h)(1)(ii).

**Marianne B. McConnaughey, Member, Dissenting:**

It is necessary to put this controversy back into proper perspective, stripped of extraneous arguments. It is not necessary to restate here the statute and regulations which were set forth in our original decisions. The Service memorandum in opposition to the brief amicus curiae (Dec. 19, 1972) outlines the development of the bond provision from the 1917 Act to the present amended broad language of 242(a) of the 1952 Immigration and Nationality Act.

There are two positions here which run a head-on collision course. Either: (1) The bond provision was an abuse of discretion, and the aliens have a constitutional and absolute right to remain here and to work without interference, even though they work

illegally, while they litigate their frivolous appeals through the Board and the courts; or (2) the Attorney General's power to prescribe the terms of bonds, arrest, release, detention, re-arrest and parole of illegal aliens was exercised in these proceedings in a rational and appropriate manner in accordance with the regulations.

If position (1) above, is true, the Attorney General has not the power under the statute and regulations to change bond provisions or, if the need arises, to create new bond provisions. The majority of the Board denies the Service motion for reconsideration and again quotes from section 242(a) of the Immigration and Nationality Act, but again they ignore the second sentence of that section which gives the Attorney General the authority to re-arrest, to revoke the bond approval, and to detain the alien until "final determination of his deportability".

There appears to be little controversy regarding the Attorney General's discretion in the matter of bail pending deportation proceedings. Under section 103(a) of the Act, (8 U.S.C. 1103) the Attorney General has broad authority to establish regulations to carry out his authority. *Bilbao-Bastida* v. *I&NS*, 409 F.2d 820 (C.A. 9, 1969), cert. dism. 396 U.S. 802 (1969). The regulations of the Attorney General must be upheld if they are founded on considerations rationally related to the statutes he is administering. *Fook Hong Mak* v. *I&NS*, 435 F.2d 728, 730 (C.A. 2, 1970). Furthermore, the Attorney General's exercise of discretion will "be overturned only by a showing of clear abuse," by demonstrating that the Attorney General's action "was without reasonable foundation". *Carlson* v. *Landon*, 342 U.S. 524, 540-41 (1952); *U.S. ex rel Belfrage* v. *Shaughnessy*, 212 F.2d 128, 129 (C.A. 2, 1954); *U.S. ex rel Polash* v. *District Director*, 169 F.2d 747, 751 (C.A. 2, 1948). The recent *U.S. ex rel Barbour* v. *District Director*, SA-72-CA-367 (U.S.D.C. Texas 1973), states that the court must not substitute its judgment for that of the Attorney General's, and that review is limited to ascertaining if there is substantial evidence in the record to support the factual basis upon which his discretionary decision rests, citing *Jarecha* v. *INS*, 417 F.2d 220, 224-25 (C.A. 5, 1969), and *Application of Maringolo*, 303 F. Supp. 1389, 1392 (S.D.N.Y. 1969).

It must be remembered that in *Carlson* v. *Landon, supra*, and in *Barbour, supra*, bail had been denied entirely, and it was held in both cases that denial of bail was not an abuse of discretion. If the Attorney General has the power to detain, surely he has the power to fix bond conditions. The lesser power is included in the greater power. The majority finds the new bond provision "impermissible", but I do not yet know why it is "impermissible". The respondents were not held without bail nor was "excessive" bail imposed. They

548

were released on the minimum bond ($500) provided by the statute.

The majority argues that the "threat of detention is the leverage which induces the obligor to post the bond." This, of course, is obvious. Anyone who posts a bond and agrees to comply with bond provisions does so in order to secure his release from detention. The threat of arrest and detention is always present and within the hands of the Attorney General. The alien, illegally here and illegally employed, is gambling that the leverage will not be used, or at least that he will not be apprehended immediately and, if apprehended; will not be detained. His past experience has shown him that he has a good chance of winning the gamble.

The argument goes further, saying that the bond is "impermissible" as a maintenance-of-status bond, because the alien is already out of status, and therefore he has no status to maintain. In response, I have pointed out that the alien in the United States legally in the status of visitor or student has no "right" to work; the statute and the regulations do not contemplate that an alien illegally in the United States has a "constitutional" or "legally protected" right to work – "unmolested" is the word used in the brief amicus. As the Service memorandum in opposition to brief amicus, December 19, 1972, notes, "Section 242(a) does for deportation proceedings what Section 212(d)(6) does for exclusion proceedings. ...'no-work' conditions are routine under Section 212(d)(6). There is no reason for a different rule under Section 242". It is admitted that the use of the bond condition in these circumstances is new, but it is not different from other maintenance-of-status bonds.

The factor which most concerns the majority, I believe, and has concerned me, is they fear that the power to detain could be used widely and abusively to prevent aliens from taking their appeals. It is possible that most powers can be abused in the absence of restraints. The courts and this Board would be very watchful to insure that abuses would not occur. The alien has a right to appeal and to litigate, even frivolously. It would be an abuse of the Attorney General's discretion in bond matters if the power were used solely as a device to defeat an appeal. This was not the situation in the cases now before us.

In these cases the aliens were repeated offenders. They might have been continued in detention until deportation proceedings were complete. Instead of being detained, they were released upon posting a bond containing a new provision. The new bond condition (that the aliens not return to the unauthorized employment) is rationally and reasonably related to the purposes of the statute. It did not constitute an abuse of the Attorney General's discretion

under the aggravated circumstances of this case. The use of the bond condition should be sustained.

### BEFORE THE BOARD
### (April 6, 1973)

**ORDER:** The majority of the Board having concluded that this case should be referred to the Attorney General for review of the Board's decision, the record is referred to the Attorney General pursuant to 8 CFR 3.1(h)(ii).

### BEFORE THE ATTORNEY GENERAL
### (January 9, 1974)

The Board of Immigration Appeals, pursuant to 8 CFR 3.1(h)(ii), referred this case to me for review. On September 7, 1972, the Board dismissed the appeal of the Immigration and Naturalization Service from the decision of a special inquiry officer who had deleted a bond condition prohibiting unauthorized employment, which the Service had utilized in connection with deportation proceedings. Thereafter, the Board denied the Service's motion for reconsideration of the Board's prior decision and, on April 6, 1973, the Board referred the matter to me.

The facts, as set forth in the decisions of the Board and in the Service's motion, are as follows: The respondents in the deportation proceedings were ten aliens, each of whom was a native and citizen of Mexico. At the time the deportation proceedings were commenced, all of the respondents were employed by California Originals, a ceramics manufacturer located in Torrance, California. [1] The respondents were arrested by the Service at the start of the deportation proceedings, and, pending a hearing, the group was released on a single bond. The bond contained a condition, inserted by the District Director, providing in effect that the respondents would not accept any employment without authorization of the Service. [2]

Subsequently, the special inquiry officer entered orders finding each of the respondents to be deportable. Five were deportable for

---

[1] Each of the respondents had worked for California Originals during a prior period of unlawful presence in the United States. Then, after leaving the United States, each had returned illegally for the purpose of resuming employment at California Originals.

[2] The condition had been approved, pursuant to 8 CFR 103.6(a), by the Regional Commissioner. The pertinent language of the bond is set forth below in Appendix A.

Prior to the present case, no such condition had ever been included in a bond used in connection with deportation proceedings.

550

having entered the United States without inspection; and the others, for having remained longer than permitted after having been admitted as visitors. Each respondent conceded deportability. The first bond was vacated and individual bonds for each alien were substituted. Thereafter, the special inquiry officer reduced the amount of each of the bonds to $500 (from $1000). The District Director prepared new bonds, all of which contained the condition regarding employment.

At the request of counsel for the respondents, the special inquiry officer reopened the bond proceedings[3]and, after a hearing, deleted the condition concerning employment. He held that the District Director had no authority to include such a condition in an appearance-and-delivery bond. The special inquiry officer stayed execution of his order, pending the Service's appeal to the Board.

On August 14, 1972, the Board heard argument regarding the Service's appeal. Under protest, the respondents posted bonds containing the disputed condition and were released.

On September 7, the Board entered an order, with two members dissenting, dismissing the Service's appeal in the bond proceeding and a separate order dismissing the appeals of the respondents from the orders of deportation.[4]In support of the former order, the majority of the Board stated that the primary purpose of bonds used in connection with deportation proceedings (i.e., bonds authorized by section 242(a) of the Immigration and Nationality Act, 8 U.S.C. 1252(a)) is to assure that the alien will appear at hearings and, if ordered deported, will be available for deportation. According to the majority, the use of such a bond to deal with the unrelated problem of illegal employment was not permissible.

At the request of the Service, the Board stayed execution of its order regarding the bond condition, pending the filing of and determination of a Service motion for reconsideration. The respondents then returned to their employment at California Originals. The District Director had advised them that such employment would be regarded as breach of the bonds.

On October 5, the Service filed its motion for reconsideration.[5]On

---

[3] The pertinent regulation, 8 CFR 242.2(b), provides that proceedings regarding bonds or custody are to be separate from deportation proceedings and are to have separate records.

[4] Subsequently, the respondents filed in the United States Court of Appeals for the Ninth Circuit petitions for review of the Board's order in the deportation proceedings. The petitions had the effect of staying the order of deportation. See 8 U.S.C. 1105(a)(3). On January 5, 1973, the petitions were dismissed by the Court of Appeals.

[5] Briefs opposing the motion for reconsideration were filed by the respondents and by the Association of Immigration and Nationality Lawyers, as amicus curiae.

April 6, 1973, the Board, again by a vote of three to two, denied the motion for reconsideration. The majority, relying in part upon judicial rulings regarding the grounds which warrant detention of an alien, held that the Service has no authority to impose, in an appearance-and-delivery bond, a condition limiting employment, and that at present the only civil sanction to deal with the employment of aliens here illegally is their deportation.

As noted above, the Board referred this matter to me, staying execution of its orders regarding the bond condition, pending my decision.[6]

The basic issues presented are (1) whether the Immigration and Nationality Act authorized the inclusion, in a bond required in connection with deportation proceedings, of a condition prohibiting unauthorized employment; and, if so, (2) whether use of such a condition in the circumstances of this case was proper.

The most pertinent statutory provision is section 242(a) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. 1252(a). That subsection provides in part that, pending a determination of deportability, an alien who has been taken into custody may, in the discretion of the Attorney General, (1) be continued in custody, (2) be released under bond containing such conditions as the Attorney General may prescribe or (3) be released on conditional parole.[7]

The position taken by the Service in this case may be summarized as follows: Under section 242(a) of the Act, and the related regulations,[8] the Service has broad authority with respect to such matters as determining bond conditions. In assessing the validity of a particular condition, the test is one of reasonableness. The

---

[6] Statements contained in the record in this case indicate that two of the respondents had left the United States prior to the Board's decision of April 6, 1973.

Information obtained from the Service after the referral to me indicates that the remaining eight respondents were ordered to appear for deportation on February 14, 1973, that five of them did appear and were deported on February 14, and that the remaining three did not appear and had not yet been located by the Service.

Thus, significant changes in the circumstances of the respondents have taken place since the filing of the Service's appeal in the bond proceeding. Nonetheless, it does not appear that the basic legal question is moot. For example, a decision that use of the condition regarding employment was proper might lead to action by the Service to enforce that condition. Cf. *Watzek* v. *United States*, 134 F. Supp. 605 (S.D.N.Y., 1955); *Earle* v. *United States*, 254 F.2d 384 (C.A. 2), cert. den., 358 U.S. 822 (1958). In any event, the question is one which may recur and a decision by me, in the present case, is appropriate.

[7] Subsection 242(a) is set forth in its entirety in Appendix B.

[8] See 8 CFR 242.2(a). The regulations are issued under a delegation of authority from the Attorney General. 28 CFR 0.105(b).

present case involves flagrant violation of the immigration laws,[9] and in these circumstances use of the condition concerning employment was reasonable.

As noted above, the majority of the Board, in its original decision and on rehearing, rejected the position of the Service. The majority recognized that the immigration laws did not permit the respondents to be employed in the United States, but held that the illegality of their employment did not provide a basis either for detention or for a condition in a bond which bond represented an alternative to detention.[10]

For reasons to be explained, my conclusions are as follows: The pertinent statutory provisions authorize, in at least some circumstances, the inclusion in appearance-and-delivery bonds of conditions which bar unauthorized employment. However, the use of such conditions should be specifically governed by a published regulation of the Service. Because no such regulation exists, the result reached by the majority of the Board should be sustained.

The provisions of section 242 of the Act deal with the several stages of the deportation process. In the proceedings before the Board, primary emphasis was placed upon section 242(a), concerning custody, release and related matters "pending...[a] final determination of deportability."[11] However, since the orders of deportation of the respondents became final after the Board's initial decision, section 242(c) is also pertinent. That provision affords the Attorney General a period of six months following the entry of a final deportation order in which to effect the alien's departure from the United States. During that period the Attorney General has discretion to detain the alien, release him on bond "containing such conditions as the Attorney General may prescribe," or release him on other conditions prescribed by the Attorney General.

The legislative history of sections 242(a) and (c), which were enacted in 1952 but derived from section 23 of the Subversive

---

[9] The factors stressed by the Service are the following: (1) a group, consisting of at least ten unlawful aliens, is involved; (2) most of the aliens are previous immigration violators who re-entered the United States for the specific purpose of resuming employment at California Originals; (3) all of the respondents are clearly deportable and their appeals are designed solely for delay; (4) there was every reason to believe that the aliens would immediately resume their unauthorized employment; and (5) if standard wages were paid, persons in the United States would be available to fill the positions.

[10] The two members of the Board who dissented expressed the view that the Attorney General has broad discretion concerning bond conditions and that the condition used in this case was, in view of the particular facts, reasonable and proper.

[11] Section 242(a) is quoted in Appendix B.

Activities Control Act of 1950,[12]indicates that Congress intended to give the Attorney General broad discretion regarding the matter of release on bond or otherwise. The nature and scope of this 1950 legislation, which clarified prior law, were explained as follows in the House and Senate Committee Reports:[13]

> The bill will expressly authorize the Attorney General, in his discretion, to hold arrested aliens in custody, or to release them under bond or on conditional parole, pending final determination of their deportability and for a 6-month period after an order of deportation is issued and while such negotiations [with officials of foreign governments] take place. The bill further provides that among the conditions of any bond exacted, or in the terms of release on parole, there shall be a condition that the alien shall be produced when required for defense against the charges upon which he appears to be deportable and for deportation if he is found subject to that action. A similar provision relates to release on bond or parole for 6 months after the alien has been ordered deported. These provisions, of course, enumerate only one of the conditions which is mandatory in the bond or as a parole condition. The bill intends that the Attorney General shall have full discretion in imposing any other conditions or terms in the bond or parole agreement which he may see fit to include. Thus, a man released on bond might have as a condition of the bond that he also be subject to make periodic reports to the immigration officials as to his whereabouts and furnish other desired information. Or a bond might provide as one of its conditions that upon demand by the Attorney General the existing bond shall be surrendered and a new bond in greater or less amount or other conditions shall be furnished. The bill intends that the Attorney General shall have untrammeled authority to impose such conditions or terms as he sees fit in releasing an alien under bond or conditional parole pending final determination of the deportability of the alien and for 6 months after an order of deportation has been issued against him.* * *

It would be unreasonable to construe the quoted language to mean that the Attorney General may impose bond conditions which are totally unrelated to the various purposes of the immigration laws, but the reports clearly demonstrate a Congressional intent to grant wide discretion otherwise.[14]

---

[12] 64 Stat. 987, 1010 (1950). Sections 242(a) and (c) were enacted as part of the Immigration and Nationality Act of 1952, see S. Rep. No. 1137, 82d Cong., 2d Sess., p. 29 (1952); H. R. Rep. No. 1365, 82d Cong., 2d Sess. (1952), p. 57.

[13] The quotation is from H.R. Rep. No. 1192, 81st Cong., 1st Sess. p. 6 (1949). The same language appears in S. Rep. No. 2239, 81st Cong., 2d Sess. p. 5 (1950). These reports related to a bill, H.R. 10, which was not enacted. However, the provisions of H.R. 10 were, with one minor exception, incorporated into § 23 of the Subversive Activities Control Act of 1950. See the Senate report on the 1950 Act, S. Rep. No. 2369, 81st Cong., 2d Sess. p. 14 (1950). Accordingly, the reports on H.R. 10 can appropriately be regarded as part of the legislative history of the 1950 Act.

[14] It should be noted that the reports' statements concerning the "full discretion" and "untrammeled authority" of the Attorney General with respect to bond conditions and related matters apply to the period before a final order of deportation, as well as to the six-month period following such an order.

There are statutory provisions other than section 242 which are pertinent. Under section 103(a) of the Act, 8 U.S.C. 1103(a), the Attorney General is given general responsibility over administration and enforcement of the immigration and naturalization laws, and he is directed to "establish such regulations; prescribe such forms of bond ... and other papers; ... and perform such other acts as he deems necessary ... [to implement such laws]." In *Earle* v. *United States*, 254 F.2d 384, 387 (C.A. 2), cert. denied, 358 U.S. 822 (1958), the court relied on section 103(a), as well as upon section 214(a), 8 U.S.C. 1184(a), in upholding the validity of a regulation calling for use of maintenance-of-status conditions in bonds required for admission of nonimmigrants.[15] The court in *Earle* went on to say that, without regard to specific statutory authorization, such a condition could be required on the basis of the Attorney General's broad power to regulate the admission of nonimmigrants.[16]

It is generally agreed that a basic purpose of the immigration laws is to protect against the displacement of workers in the United States.[17] Thus, under an approach similar to that used in *Earle*, it may be that section 103(a) and the Attorney General's broad authority to enforce the immigration laws afford an independent basis for requiring of persons subject to deportation proceedings bonds prohibiting unauthorized employment. Such bonds are frequently required of nonimmigrant aliens seeking either admission to the United States or an extension of their stay.[18] It may be proper to impose a similar requirement upon aliens who become subject to deportation proceedings. The result would be a bond serving two related but independent purposes.[19]

None of the statutory provisions discussed above has given rise to a judicial decision dealing specifically with a bond condition of the kind at issue here. Although the Board cites a number of judicial precedents in this connection, I find that they relate mainly to the detention of aliens. Thus, in *Carlson* v. *Landon*, 342 U.S. 524 (1952), the Court, with four Justices dissenting, upheld the denial of bail to certain aliens who belonged to the Communist Party, pending determinations of deportability, on the ground that

---

[15] That is, a condition requiring the alien to maintain the status under which he was admitted as a nonimmigrant.

Section 214(a) relates to conditions in bonds required for the admission of nonimmigrant aliens.

[16] Cf. *Illinois Surety Co.* v. *United States*, 229 F. 527, 532 (C.A. 2, 1916).

[17] See section 101(a)(15), 8 U.S.C. 1101(a)(15) and section 212(a)(14), 8 U.S.C. 1182(a)(14); and 8 CFR 214.1(c).

[18] See section 214(a), 8 U.S.C. 1184(a); 8 CFR 214.1(a).

[19] Cf. the dissents of Member McConnaughey.

their release could pose threats to national security or public safety. In *Rubenstein* v. *Brownell*, 206 F.2d 449, 456 (D.C. Cir., 1953), aff'd per curiam by an equally divided court, 346 U.S. 929 (1954), the Court of Appeals stated that detention of the alien (who was seeking judicial review of an administrative order of deportation) would be improper since there was no indication that he would abscond or engage in subversive or criminal activity. Another of the cases referred to by the Board, *United States* v. *Witkovich*, 353 U.S. 194 (1957), related to the supervision, under section 242(d), of an alien who was subject to a deportation order that had been outstanding for more than six months. The Court held that the authority of the Attorney General to require information from the alien during the period of supervision was restricted to matters relating to his availability for deportation.[20]

In my opinion, neither the above cases nor any other judicial ruling forecloses the possibility of utilizing, on the basis of section 242(a) or (c), a bond condition prohibiting unauthorized employment. Even under the most narrow reading of those provisions, there are situations in which use of an employment condition would be proper. For example, there may be cases in which an alien's past employment would have a direct bearing upon his availability for hearings or deportation or upon national security.[21] At the very least, in such cases, use of an employment condition would be proper with respect to the six-month period following a final order of deportation.[22] In addition, the various purposes of the immigration laws, including safeguarding employment opportunities for legal residents, may suggest the appropriateness of various bond conditions.

I am thus of the view that there is authority in sections 242 and 103 for the Service to require, in some circumstances, a bond condition prohibiting unauthorized employment. Nevertheless, I believe for a number of reasons that before a condition of that nature is imposed, there should be a regulation of the Service dealing specifically with the subject.[23]

---

[20] In *Witkovich*, the Court noted that the period of supervision of an undeportable alien might last for the remainder of his life; the Court distinguished *Carlson* v. *Landon* for the reason that it involved detention "during the customarily brief period pending determination of deportability." 353 U.S. at 201.

[21] Apparently, the Service did not contend that such a relationship existed in this case.

[22] In assessing the validity or constitutionality of a restraint placed upon the activities of an alien subject to deportation proceedings, factors to be considered include the nature of the activities, the forum making the determination and the procedures. See 70 Harv. L. Rev. 718 (1957), cited in the *Witkovich* opinion.

[23] The present provisions regarding bond conditions are not sufficiently spe-

First, it appears that not until recently did the Service attempt to use in bonds related to deportation proceedings a condition regarding employment. In my opinion, while this history of non-use is not determinative of the question of authority,[24] it suggests the administrative desirability of having a formal basis for the new practice.

Second, there is the potential problem, acknowledged by the Service, of undue utilization of such a condition. A regulation could indicate, at least generally, the circumstances which might result in imposing an employment condition. Such standards would provide guidance to Service personnel involved in day-to-day implementation and would be a safeguard against abuse of discretion.[25] Also, a regulation would provide notice to aliens and employers. The standards set forth in a regulation might be of use in affording a basis for decision making in the event of administrative or judicial review.[26]

Finally, by following the process of proposed rule making, the Service could obtain the views of interested parties. This would help to assure proper consideration of the various points of view.

In sum, regarding the basic question of statutory authority, my view differs from that of the majority of the Board. Still, because there was no specific regulation in effect, I concur in the result reached by the Board and do not sustain the employment condition in this case.

The case is returned to the Board for further proceedings pursuant to 8 CFR 3.1(h)(2).

## APPENDIX A
### Bond Conditions

The pertinent provisions of the bonds, including the condition regarding unauthorized employment, are as follows:

---

cific. The provision regarding bonds and related aspects of deportation proceedings, 8 CFR 242.2(a), is general in its terms. Under 8 CFR 103.6(a), any non-standard rider to a bond must be approved by a regional commissioner, but, in my opinion, additional substantive safeguards would be appropriate with respect to the condition at issue here.

[24] *United States v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586 (1957); see also *FTC v. Dean Foods*, 383 U.S. 597 (1966).

[25] Cf. *Wong Wing Hang v. Immigration and Naturalization Service*, 360 F.2d 715, 718 (C.A. 2, 1966), where the Court stated:

In the absence of standards in the statute itself, proper administration would be advanced and reviewing courts would be assisted if the Attorney General or his delegate, without attempting to be exhaustive in an area inherently insusceptible of such treatment, were to outline certain bases deemed to warrant the affirmative exercise of discretion and other grounds generally militating against it. * * *

[26] See footnote 25.

557

In consideration of the granting of the application of the above named alien for release from custody under a warrant of arrest issued by the Attorney General charging that he is unlawfully in the United States, provided there is furnished a suitable bond as authorized by Section 242 of the Immigration and Nationality Act, the obligor hereby furnishes such bond with the following conditions i.e.: If said alien is released from custody and if said alien does not accept employment in the United States on or after the effective date of this bond unless authorized by the Immigration and Nationality Service and if the above obligor shall cause said alien to be produced or to produce himself to an immigration officer of the United States upon each and every request of such officer until deportation proceedings in his case are finally terminated or until said alien is actually accepted by such immigration officer for detention or deportation, then this obligation shall be void; otherwise it shall immediately become due and payable; Provided, that it is hereby specifically agreed by the obligor that no order issued by or under the authority of the Attorney General by virtue of which issuance or execution of an order of deportation is or may be deferred, or by virtue of which the said alien is or may be permitted to depart voluntarily from the United States, shall be in any manner construed to impair or render void this obligation or any part thereof.

## APPENDIX B
### Section 242(a) of the Immigration and Nationality Act

Section 242(a) of the Act, 8 U.S.C. 1252(a), is as follows:

Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (1) be continued in custody; or (2) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (3) be released on conditional parole. But such bond or parole, whether heretofore or hereafter authorized, may be revoked at any time by the Attorney General, in his discretion, and the alien may be returned to custody under the warrant which initiated the proceedings against him and detained until final determination of his deportability. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or parole pending final decision of deportability upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability.