# In re Luis Alfonso SANCHEZ-Avila, Applicant

## File A92 764 131- El Centro

### *Decided June 14, 1996*

### U.S. Department of Justice
### Executive Office for Immigration Review
### Board of Immigration Appeals

(1) Under the present statutory and regulatory scheme, an Immigration Judge properly declined to order an alien excluded in absentia where the Immigration and Naturalization Service did not detain or parole the alien at the time he applied for admission to the United States, but instead returned him to Mexico with instructions to appear for an exclusion hearing at a later date.

(2) By directing an applicant for admission to return to Mexico after being served with a Notice to Applicant for Admission Detained for Hearing before an Immigration Judge (Form I-122), the Service in effect consented to the alien's withdrawal of that application when the alien elected not to return to pursue his application for admission to the United States.

Pro se

FOR APPLICANT AS AMICUS CURIAE: Daniel C. Horne, Esquire and Daniel M. Kowalski, Esquire, Denver Colorado

FOR IMMIGRATION AND NATURALIZATION SERVICE: David Dixon, Chief Appellate Counsel

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring and Dissenting Opinion: ROSENBERG, Board Member.

HOLMES, Board Member:

In a decision dated March 9, 1995, the Immigration Judge ordered exclusion proceedings terminated in this and 12 other cases. He and another Immigration Judge, who had terminated other exclusion proceedings on the identical grounds, certified their decisions to this Board for review pursuant to the provisions of 8 C.F.R. § 3.1(c) (1995). The Immigration and Naturalization Service filed a brief in response to the Immigration Judges' decisions, arguing that the orders of termination were in error and requesting that the proceedings be remanded with instructions to proceed in absentia.

As the decisions in these certified cases presented significant questions of statutory and regulatory construction and as the applicants not only were unrepresented, but also did not appear at their exclusion proceedings or respond to the notice of certification, the Board invited the submission of amicus curiae briefs. Pursuant to the Board's request for further briefing, the Service filed a supplemental brief. An amicus brief ultimately was filed on behalf of the American Immigration Lawyers Association. The decision in this case will be fully addressed as it is representative of the others. The decision of the Immigration Judge will be affirmed in part.

## I. FACTS

The applicant apparently arrived by vehicle at the land border port of Calexico, California, on November 10, 1994, and applied for entry into the United States as a resident alien commuter. He was not admitted. Instead, that same day he was served with a Notice to Applicant for Admission Detained for Hearing Before Immigration Judge (Form I-122), which put him on notice that he appeared to come within the exclusion provisions of sections 212(a)(2)(A)(i)(II) and (C) of the Immigration and Nationality Act, 8 U.S.C. §§ 212(a)(2)(A)(i)(II) and (C) (1994). Both exclusion grounds relate to involvement with controlled substances.

The Form I-122 advised the applicant that he was "detained under the provisions of section 235(b) of the Immigration and Nationality Act, as amended, for a hearing before an Immigration Judge to determine whether or not [he was] entitled to enter the United States or whether [he should] be excluded or deported." This form also reflected that the hearing before the Immigration Judge was to be scheduled at a later date and that the applicant wanted the notice of hearing sent to an address in Mexico. On November 10, 1994, the applicant also signed a separate, untitled form that in part reflected that he understood that he had been placed in exclusion proceedings and that the notice of the scheduled hearing would be sent to him at the address in Mexico that he had provided. This form included the warning: "If you do not appear for your scheduled hearing, you will be ordered excluded and deported in your absence."

On December 15, 1994, a notice of hearing was mailed to the applicant by the Office of the Immigration Judge (now called the Immigration Court) advising him that an exclusion hearing before an Immigration Judge was scheduled for 8:00 A.M. on February 7, 1995. This notice was sent by regular mail to the applicant and apparently was not returned to the Immigration Court as undeliverable. The address to which the notice was mailed was largely complete. However, it was not identical to the address provided by the applicant.[1]

---

[1] In view of the resolution of this case, the discrepancy in addresses need not be further addressed. We note, however, that supplemental briefing was requested on the issue of mail service to Mexico. Any issues posed by such service were not further addressed by the parties.

When the exclusion proceedings convened on February 7, 1995, the Immigration Judge noted that the applicant had not appeared for the hearing. The Immigration Judge advised the Service that there was an initial jurisdictional issue which needed to be addressed because the applicant, who had not appeared, had not been detained or paroled by the Service. The Immigration Judge indicated that he had received briefs from the Service on the relevant jurisdictional issue in other cases and he was prepared to enter an order terminating proceedings if the Service wished him to proceed with this case rather than "renoticing it." The Service requested that the Immigration Judge proceed with a decision.

## II. DECISION OF THE IMMIGRATION JUDGE

In his March 9, 1995, decision, the Immigration Judge emphasized the following facts. The applicant sought entry into the United States at Calexico, California. Immigration inspectors were unable to determine that he was entitled to enter the United States. The applicant was refused admission. However, he was neither detained nor paroled by the Service. Instead, he was held only so long as was necessary to complete the initial inquiry and be served with a charging document initiating exclusion proceedings (the Form I-122). He was then told to wait in Mexico for his hearing. The Immigration Judge characterized this sequence of events as "tantamount to temporary exclusion by the officer at the port of entry." The Immigration Judge noted that the charging document was filed with the Immigration Court "following the release and temporary exclusion of the [applicant] to Mexico." The alien did not appear at the scheduled exclusion hearing to pursue his application for admission.

In the Immigration Judge's view, this case raised the threshold issue of "whether an Immigration Judge has jurisdiction to hear an exclusion case in absentia if the alien has not been detained or paroled under the Act." "Applying the plain language of the statute," the Immigration Judge concluded that he was "without jurisdiction to proceed in absentia in the limited circumstances of [this case.]"

The principal statutory provisions relating to the entry and exclusion process are sections 235 and 236 of the Act, 8 U.S.C. §§ 1225 and 1226 (1994). The Immigration Judge pointed out that under section 235(b) of the Act the Attorney General "*shall detain* for further inquiry [any alien] who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land." Section 236(a) of the Act provides that an Immigration Judge "shall have authority in any case to determine whether an arriving alien *who has been detained for further inquiry under section 235* shall be allowed to enter or shall be excluded and deported." (Emphasis added.) The Immigration Judge noted that in discussing these provisions of law, the United States Supreme Court had observed that aliens who do not

appear entitled to enter the United States will be "detained" for examination and that a hearing will be held before an Immigration Judge "if an alien is so detained." *See Jean v. Nelson,* 472 U.S. 846, 855 (1985); *Landon v. Plasencia,* 459 U.S. 21, 27-28 (1982).

The Immigration Judge concluded that this language of section 236 of the Act, particularly as analyzed by the Court, is "plain." By its terms, if an alien "has not been detained for further inquiry, or has not been paroled (as a subset of detention), then the Immigration Judge does not have any authority in the matter." The Immigration Judge noted that, when the language of the controlling statute is plain, there is no issue of construction or interpretation. Rather, "the plain language is applied." *See United States v. Menasche,* 348 U.S. 528, 538-39 (1955).

However, the Immigration Judge further found that the "plain words of the statute are even more clear when the overall statutory and regulatory scheme about exclusion is examined." In this regard, he observed that the statutory scheme is implemented in part by 8 C.F.R. § 235.3(b) (1995), which provides:

> Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents . . . or who arrives with documentation which appears on its face to be false, altered, or to relate to another person, . . . *shall be detained* in accordance with section 235(b) of the Act. Parole of such aliens shall only be considered in accordance with § 212.5(a) of this chapter. (Emphasis added.)

Under 8 C.F.R. § 235.3(c), aliens who arrive with documentation, but who appear to be inadmissible, "may be *detained, paroled, or paroled for deferred inspection.*"(Emphasis added.) The Immigration Judge also noted that the provisions of 8 C.F.R. § 235.3(d) make clear that "the Service *will assume custody of any alien* subject to detention under § 235.3(b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger."

The Immigration Judge observed that the "parole statute likewise shows the centrality of detention to the exclusion statute." Section 212(d)(5) of the Act provides in relevant part:

> The Attorney General may . . . in [her] discretion parole into the United States temporarily under such conditions as [she] may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the *custody* from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States. (Emphasis added.)

The "use of the word 'custody' [in this section] makes clear the intent of Congress [that persons] not paroled are expected to be in custody." In fact, the Immigration Judge noted, the United States Court of Appeals for the Ninth Circuit recently opined that this very language in section 212(d)(5)

"suggests that excludable aliens are to be held in 'custody' whenever the Attorney General finds that parole is not appropriate." *See Barrera-Echavarria v. Rison,* 44 F.3d 1441, 1446 (9th Cir.), *cert. denied*, 516 U.S. 976 (1995).

The Immigration Judge ruled that this statutory and regulatory language makes clear that the detention referred to in sections 235 and 236 of the Act does not contemplate a mere stop at the border; rather it contemplates "custody." The "harshness" of this custody requirement, however, is ameliorated by the parole provisions of section 212(d)(5). In this regard, the Immigration Judge noted, the Supreme Court has observed that parole is "simply a device through which needless confinement is avoided while the administrative proceedings are conducted." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958). The Immigration Judge concluded that "the Court was of the view that parole was the answer to detention and that, without parole, aliens would otherwise be in 'needless' confinement . . . while the administrative proceedings are conducted."

The Immigration Judge noted that the statute does provide limited authority under which an alien can be temporarily excluded without being detained or paroled. *See* section 235(c) of the Act. However, this statutory authority to temporarily exclude aliens is limited to grounds of excludability related to national security, a matter not in issue here.

Considering the statute, the regulations, and the caselaw, the Immigration Judge ruled that he could not "hold a hearing in absentia when the alien seeking admission has not been detained (or paroled) for further inquiry under section 235 and has not appeared before the court to submit to its authority." In the present case, the Service did not detain or parole the alien as mandated by law. Instead, the Immigration Judge opined, the Service "seems to have embarked on a policy of temporary exclusion beyond the security bounds of section 212(a)(3) as limited under section 235(c)."

The Immigration Judge was not persuaded by the Service's argument that it had a long history of returning aliens at land border points to Mexico or Canada to await their exclusion hearings. The Immigration Judge noted that "custom alone does not make a practice law or even lawful in the American system of justice." Moreover, the Immigration Judge concluded, if the practice in question had a long history, it was not one that was well known, particularly in that the Service's policy had never been published. There was no indication that Congress was even aware of the actions of the Service in this regard. Moreover, the Immigration Judge stated, the Service's evidence in support of its claim of a longstanding practice in part conflicted with its own *published* parole regulations. *See* 8 C.F.R. § 212.5(a) (1995).

The Immigration Judge also found no meaningful support for the Service's practice in the Service Operations Instructions because those instructions do not have the force of law or regulation and are not binding on Immigration Judges.

The Immigration Judge finally rejected the Service's argument that "its practice of temporary exclusion is a permissible exercise of the plenary power of the government to control the admission of aliens." The Immigration Judge quoted the following from *Jean v. Nelson, supra:* "'This case does not implicate the authority of Congress, the President, or the Attorney General. Rather, it challenges the power of low-level politically unresponsive government officials to act in a manner which is contrary to federal statutes . . . .'" *Id.* at 853 (quoting Brief for Petitioners). The Immigration Judge concluded that "the plenary power doctrine was not a catch-all, cure-all for the Service." This was particularly true where the procedures available to the Service to promulgate rules by regulation had not been followed.

The Immigration Judge opined that a "weak argument" could be made that, since the alien was briefly detained at the time of the inspection, such detention, however slight, could bring the alien within the ambit of section 236 of the Act. However, in the Immigration Judge's view, this brief stop was not "detention for further inquiry" as defined by the statute.

In summary, the Immigration Judge found that against "this historical, statutory, and regulatory backdrop, the plain language of section 236 is unassailable." Under section 236 of the Act, an Immigration Judge "shall have authority in any case to determine whether an arriving alien *who has been detained for further inquiry under section 235* shall be allowed to enter or shall be excluded and deported." (Emphasis added.) The alien in this case was not detained for further inquiry as required by section 235 of the Act and 8 C.F.R. § 235.3. The alien was not paroled under the authority of section 212(d)(5) of the Act. He did not appear before the court to "submit to its authority." Instead, he was "temporarily excluded from the United States and released into Mexico even before charging documents were filed with the court." On these facts, the Immigration Judge held, he had no authority to make a determination regarding excludability. Accordingly, he terminated proceedings and certified his decision to this Board for review.

## III. POSITION OF THE IMMIGRATION AND NATURALIZATION SERVICE

### A. March 23, 1995, Service Brief

On certification, the Immigration and Naturalization Service argues that the Immigration Judge erred in terminating the exclusion proceedings. The Service submits that the proper statutory interpretation of section 235 of the Act, particularly in light of the "plenary power" of the United States to control its borders, vests jurisdiction with the Immigration Court to proceed in absentia under the facts of this case. According to the Service the Immigration Judge erred in finding that "either parole or detention of aliens in exclusion proceedings, pursuant to INA §§ 212(d)(5) or 235(a), is a condition precedent to [his] jurisdiction, and that the 'exclusion policy' of the Service

[of requiring certain aliens to await their exclusion hearings in either Mexico or Canada] is tantamount to 'temporary exclusion' under INA § 235(c)."

The Service argues that it has three options when it refuses to admit an alien at a port of entry and places the alien in exclusion proceedings. It can: (1) place the alien in custodial detention until exclusion proceedings are completed; (2) parole the alien into the United States until exclusion proceedings are completed; or (3) if the alien seeks entry at a "land" port (Mexico or Canada), require the alien to remain outside the United States pending his or her exclusion hearing.

The Service submits that this third option of "[r]equiring aliens to remain in Mexico or Canada pending their exclusion proceedings is a longstanding practice which has survived years of scrutiny." Large numbers of aliens are placed in exclusion proceedings each year and are required to remain in Canada and Mexico pending their hearings. The "propriety of this action has endured without challenge until termination of the subject exclusion cases. Moreover, a [p]ragmatic analysis of the exclusion policy imparts a clear understanding that a contrary practice ultimately would result in a significant burden on tax payers as a result of increased detention, meaningful loss of control over the borders as a result of liberal granting of parole, and the virtual death of exclusion as a means of immigration control."

The Service's argument proceeds as follows. A basic premise of immigration law is that an alien within any of the classes of excludable aliens enumerated in section 212(a) of the Act shall be excluded from admission into the United States. Both the language and history of the Act reflect a congressional intent that an exclusion hearing is the sole and exclusive procedure for determining whether an alien should be admitted. This authority "is derived from the plenary power of the United States to preserve its dominion, as exercised by executive and legislative branches of our federal government."

This plenary power doctrine is "the essence of this nation's legal right to preserve the integrity of its borders and ultimately its sovereignty." And, the Service argues, its exclusion policy of requiring certain aliens to await their exclusion hearings in either Mexico or Canada (hereinafter "the exclusion policy") is "a practical exercise of plenary power." The Immigration Judge's rejection of the Service's authority in this regard is "misguided, and it represents legal reasoning whose trajectory is well outside of established law on this issue."

As legal support for this exclusion policy, the Service cites *Mersereau v. Ingham,* 875 F. Supp. 148 (W.D.N.Y. 1975); two recent unpublished district court decisions[2]; a reference in Gordon & Mailman, *Immigration Law and*

---

[2] Both before the Immigration Judge and on certification, the Service referenced two unpublished district court decisions. Copies of those decisions were not submitted to the Immigration Judge. The Service was requested to provide the Board copies of these decisions, which has not been done. Accordingly, the referenced unpublished decisions will not be further considered.

*Procedure*; a San Diego District Director memorandum, dated December 26, 1984; and INS Operations Instructions 235.6(a) and (b) (1995). The Service also references the Supreme Court decisions in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), and *United States ex rel. Polymeris v. Trudell*, 284 U.S. 279 (1932).

The Service notes that it has a statutory obligation to inspect an alien presenting himself for admission to the United States under section 235 of the Act. An immigration inspector may detain the alien for further inquiry to be conducted by an Immigration Judge if he finds the alien is not clearly and beyond a doubt entitled to admission to the United States under the terms of section 235(b) of the Act. An alien placed in exclusion proceedings is entitled to a hearing before an Immigration Judge under the terms of section 236 of the Act. Moreover, the alien "has no right to unilaterally withdraw his application for admission." *See Matter of Gutierrez*, 19 I&N Dec. 562, 564 (BIA 1988).

Further, the Service emphasizes, jurisdiction "over an exclusion proceeding vests upon the filing of the Notice to Applicant for Admission Detained for Hearing before Immigration Judge (Form I-122) with the appropriate Office of the Immigration Judge, 8 C.F.R. § 3.14, and [that] Immigration Judges shall proceed in absentia if the alien fails to appear for hearing." *See* 8 C.F.R. § 3.26 (1995); *see also Matter of Nafi*, 19 I&N Dec. 430 (BIA 1987).

Citing section 101 of the Act, 8 U.S.C. § 1101 (1994), et seq., and 8 C.F.R. Part 1 (1995), the Service submits that the practice of requiring certain aliens placed in exclusion proceedings to remain outside of the United States is "unquestionably within Congress' mandate to the Service to manage immigration of aliens to the United States." Such policy "also is within the plenary power of the executive branch's authority over foreign policy and national security." "Indeed," the Service continues, "if the stark choice proposed by the Immigration Judges—either custodial detention or parole—is the only lawful course of conduct, the ability of this nation to deal with mass migrations such as those from Cuba and Haiti very well could be undermined." But, "such undesirable consequences can be avoided by proper application of the judicial precedents which have addressed immigration concerns for more than 100 years."

Whether an alien remains in Mexico or Canada awaiting a hearing, is paroled into the United States, or is placed in custodial detention, is immaterial to the Immigration Court's jurisdiction, the Service argues, because "all aliens in exclusion proceedings are considered in law to be outside the United States." The jurisdiction of the Immigration Court is not premised upon the physical presence of an alien either in court or within the boundaries of the United States; rather, its jurisdiction vests when a charging document is filed with the court.

Thus, the Service submits, the Immigration Judge's "proclamation that the Service must either detain or parole an alien seeking entry into this nation

before jurisdiction may vest in the Immigration Court is flawed." The "imperfections in this hypothesis are exposed by a review of statutory canons of interpretation and a probe of *Mersereau v. Ingham*, [*supra*]." The Immigration Judge's reading of sections 235 and 236 of the Act "pilots the unwary into a semantical snare without benefit of an understanding of the statute's broad purposes." This manner of legal analysis "is bereft of extra-textual aids such as examination of the statutory scheme of immigration laws promulgated by Congress and the Service's interpretation of its legislative mandate." The Immigration Judge's decision-making process and resulting statutory analysis "far removes the law from pragmatic realities which are an integral part of the law's purpose in a civilized and functional society."

The Service argues that the Immigration Judge's departure from "legal pragmatism" is brought into particular focus upon examination of *Mersereau v. Ingham, supra. Mersereau* involved an alien from Canada who had been neither paroled into the United States nor placed into custodial detention. He was required to remain outside the United States pending his exclusion proceedings. He successfully litigated the issue of parole in the United States district court, but the "Service's legal authority to turn him around at the border and to place him in exclusion was never questioned."

The Service further notes that one of its "quandaries in responding to the Immigration Judge's termination of these matters is determining whether the issue framed by the Immigration Judges solely is 'jurisdictional' or whether there are traces of constitutional dabbling or motivation in the mix." However, the Service states, once terms in a statute acquire "settled judicial or administrative interpretations, and Congress subsequently amends or revises that statute without substantial change, it is reasonable to conclude that Congress intended to adopt the settled interpretation." *Citing Shaughnessy v. United States ex rel. Mezei, supra*, and *United States ex rel. Polymeris v. Trudell, supra,* the Service argues that since at least 1932, the Supreme Court has held that aliens seeking entry into the United States from contiguous countries may be forced to wait outside its borders while their right to a hearing is being determined. The Service also urges that this principle was acknowledged by the United States Court of Appeals for the Eleventh Circuit in *Jean v. Nelson*, 727 F.2d 957, 972 (11th Cir. 1984), when the court noted that parole was an "act of extraordinary sovereign generosity" and that similarly situated aliens "would probably be turned away at the border" if they sought to enter by land, rather than sea or air.

The interpretation of the statutory scheme, the Service continues, "must not be viewed with a blind eye toward the dire consequences of legal misconstruction when the answer to the subject controversy easily may be found within established law." In this regard, the Service asserts, the Immigration Judges erred in construing the word "detained" in sections 235 and 236 to only mean actual custodial detention. This construction ignores well-

established meanings of the word "detained" to also mean "to check, to stay, to stop or restrain from proceeding."

The Service concludes its initial brief arguing that its exclusion policy comports with law; that parole or detention of an alien is not a condition precedent to vest jurisdiction with the Immigration Court in exclusion proceedings; that by longstanding legal definition all aliens in exclusion proceedings are considered to be outside of the physical boundaries of the United States; that its exclusion policy is consistent with this legal fiction; that the Service's interpretation of section 235 of the Act is reasonable and a responsible use of the plenary power of the United States to control its border; that the Service has used its lawful authority to require aliens awaiting exclusion proceedings to remain outside the boundaries of this nation pending hearings; and, that the Immigration Judge's decision fails to acknowledge the Service's "right to construe and execute its legislative mandate to secure our nation's borders."

## B. Supplemental Brief of the Service

On July 11, 1995, the Service submitted a supplemental brief in which it submits that the "linchpin of the judges' determination that they lack jurisdiction in these cases is their interpretation of the word 'detained' to mean solely physical custody." Although the term "detain" may be defined as requiring physical custody, such an unnecessarily narrow definition is neither reasonable nor consistent with Congress' statutory and regulatory scheme controlling the exclusion of aliens.

Under the Immigration Judge's interpretation, the Service states, it would "be required to *physically detain in custody* every alien who may not appear to the examining immigration officer to be clearly and beyond a doubt entitled to land." Although this interpretation of the Act "may be considered reasonable at an airport within the United States, it is illogical and contrary to longstanding practice at land border ports of entry." A more reasonable understanding of the statutory language, particularly at land border ports of entry, is that "the INS must *restrain* aliens *from proceeding* into the United States if the immigration inspector determines that the alien may not be clearly and beyond a doubt entitled to land." This reading of the statute is consistent with the established Service practice that permits immigration inspectors to allow applicants to withdraw their applications for admission. This practice makes clear that inspectors are *not* required to take every applicant who may be inadmissible into custody.

"Moreover," the Service continues, "section 236 authorizes the Immigration Judge to conduct exclusion proceedings to determine whether aliens who are *restrained from proceeding* into the United States are, in fact, admissible to the United States." The plain language of section 235 and 236 "grants Immigration Judges the authority to hear exclusion cases without regard to whether the alien is detained in custody or whether the alien is in the United States."

Although not a matter of record, the Service states that along the northern border of the United States aliens are routinely returned to Canada to await their exclusion hearings. In Buffalo, New York, for example, "approximately 120-140 aliens are placed into exclusion proceedings each week and returned to Canada to await their hearings." Parole of an alien into the United States from Canada to await an exclusion hearing is a rare exception. Only "suspected alien smugglers and aliens convicted of aggravated felonies are physically detained to await an exclusion hearing." Approximately 65% to 70% of the aliens who are returned to Canada to await their hearings appear for hearings. The Immigration Judges in Buffalo routinely order those who do not appear excluded in absentia.

In its supplemental brief, the Service reiterates that all aliens in exclusion proceedings are considered to be legally outside the United States. The Service notes that the Immigration Judge's decision in this case ironically would divest him of jurisdiction in exclusion proceedings when the alien is, in fact, outside the United States. Such a result would be inconsistent with the overall statutory and regulatory scheme concerning exclusion.

The Service notes that Board precedent is clear that once an alien comes within the jurisdiction of the Service in an exclusion proceeding, the alien may not defeat that jurisdiction by unilaterally withdrawing his application for admission. *See Matter of Gutierrez, supra; Matter of Vargas-Molina,* 13 I&N Dec. 651 (BIA 1971). And, the Service argues, the Immigration Judge's decision in this case is clearly contrary to this Board's precedent because it permits aliens to defeat jurisdiction by not attending their exclusion hearings. Moreover, the governing regulations require an Immigration Judge to conduct an in absentia hearing if the applicant fails to appear and the Immigration Judge is satisfied that the court provided the applicant with written notice of the time and location of the proceeding to the most recent address in the record of proceeding. *See* 8 C.F.R. § 3.26(a) (1995).

In conclusion, the Service submits:

> Immigration Judges have the authority under the Act and the regulations to hear an exclusion case of any applicant for admission whom the INS restrains from proceeding into the United States. The [Immigration] Judge's jurisdiction is established by filing by the Service of a charging document with the Office of the Immigration Judge. Furthermore, the regulations require the court to proceed in absentia if the applicant does not appear for hearing, following written notice.

Accordingly, the Service urges that the decision of the Immigration Judge in this case should be reversed and the record remanded for proceedings in absentia.

## IV. POSITION OF AMICUS

The American Immigration Lawyers Association ("AILA"), pursuant to 8 C.F.R. § 292.1(e) (1995), filed an amicus brief in support of the decisions of

the Immigration Judges in these certified cases. Addressing six principal points, AILA argues that Immigration Judges have the authority to rule on jurisdictional issues and that the Immigration Judge's decision in this certi-fied case is correct.

AILA first states that this case revolves around a simple issue of statutory construction and that the Immigration Judge properly concluded that the "plain language of the [Act] and its implementing regulations dictate that Immigration Judges retain subject-matter jurisdiction over exclusion hear-ings *only* for applicants for admission who have either been detained or paroled by the INS."

As AILA points out, section 235(b) states that an alien who does not appear clearly and beyond a doubt entitled to land "*shall be detained* for fur-ther inquiry to be conducted by a special inquiry officer." Section 236(a) of the Act explicitly states that the Immigration Judge "shall have authority in any case to determine whether an arriving alien *who has been detained for further inquiry* under section 1225 of this title shall be allowed to enter or shall be excluded and deported." The Supreme Court has observed that an Immigration Judge's jurisdiction is contingent upon the Service actually detaining (or paroling) the alien in question. *See Landon v. Plasencia, supra*, at 27-28. Thus, according to AILA, the language of the Act, particularly after Supreme Court interpretation, makes clear that an "alien must be currently detained for examination before an [Immigration Judge] has jurisdiction to hold an exclusion hearing."

Second, amicus states, the Immigration Judges accorded the word "detained" in sections 235 and 236 of the Act with its only accepted meaning, "physical custody." A review of over 100 Board decisions, from Volume 1 of the *Administrative Decisions under Immigration and Nationality Laws of the United States* to present, "reveals that the Board consistently uses and under-stands the term 'detention' to mean physical custody, and *never* the type of temporary repulsion into Mexico or Canada now posited by the Service." Moreover, the express reference to "custody" in section 212(d)(5) of the Act and in the regulations at 8 C.F.R. § 235.3(d) makes clear that both Congress and the Service have already contemplated that persons not paroled into the United States are expected to be held in custody.

The Service argues in this case for an interpretation of the word "detained" to also include the practice of "repulsing" aliens from the United States. However, amicus submits, such a "new interpretation is oddly convenient [in that when] trying to defend its Haitian detention policies in the 1980's, INS has already interpreted the same word 'detain' to *necessarily imply* confine-ment." *See Louis v. Nelson,* 544 F. Supp. 973, 993 (S.D. Fla. 1982), *aff'd in part, rev'd in part sub nom. Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983). In both Haitian and Cuban litigation, the Service has steadfastly argued that sections 235 and 236 of the Act "require the INS to take allegedly inadmissi-ble applicants into *physical custody,* and that release from said custody

(parole) under [section 212(d)(5)] is to be the rarely-employed exception to the rule of physical custody." *See Louis v. Nelson, supra; Barrera-Echavarria v. Rison, supra.* The Service, "having fought for years for the right to construe the word 'detain' to mean 'confinement,' . . . severely undercuts its current claim that the word 'detain' need not necessarily imply confinement or parole." It cannot, amicus urges, now claim that the "mere repulsion" of aliens at the border constitutes the detention required by these sections of the Act.

Third, amicus asserts, even if the Service's "novel interpretation" of the Act were deemed rational and such a reversal of its arguments were permissible, this new statutory interpretation could only be implemented in conformance with the requirements of the Administrative Procedure Act ("APA") because it would have to be deemed "the adoption of a new 'rule,' as defined by the [APA]." According to AILA, "It has general applicability and future effects in a way designed to implement, interpret, or prescribe law or policy." Thus, it was error for the Service to adopt this policy without adhering to the APA's rulemaking procedures. As such, the Service "cannot enforce such a policy, and in no way can it expect the Executive Office for Immigration Review to become complicit to such an unlawfully enforced policy."

Further, amicus states, the Immigration Judges correctly ruled that the Service may not "temporarily exclude" any aliens other than those listed in section 212(a)(3) of the Act and that none of the aliens involved in this case were excludable under that section.

Fifth, it is argued that the Service's claim on appeal that requiring aliens to remain in Canada or Mexico pending their exclusion proceedings "is a long-standing practice which has survived years of scrutiny" is "utterly and egregiously false—a fact immediately apparent from reading both the briefs and the Immigration Judge's decision." Further, AILA states, "No court has *ever* reviewed INS' policy of temporarily excluding aliens not found to pose a national security risk." And the Service, "for all its posturing, has produced *no* case scrutinizing its policy." Had the Service done so, "their briefs certainly would have contained fewer dubious policy arguments acting in lieu of any real legal authority."

AILA finally urges that the Service's argument that the San Diego District Director has "plenary power over immigration matters is a ridiculous claim [which] begs for some legal authority, [yet] INS cites none." According to amicus, "It is Congress, the President, and the Attorney General, who may at times exercise plenary power over immigration matters, not the San Diego district director." Plenary authority does not lie with lower level officers such as district directors. While the Service apparently "takes umbrage" at the San Diego District Director being described as a low level official, within the context of the plenary power doctrine such is the case. Within this context, "high level" executive officials are such officials as the President and the Attorney General.

In conclusion, amicus submits, the position of the Service now being argued defies the statutory requirements, its implementing regulations, caselaw, and the APA. The Service "must take aliens such as the applicant into custody, or alternatively parole them in, or allow them to withdraw their applications for admission into the United States—an increasingly frequent option." These are "the *only* options (with a few notable exceptions, e.g., deferred inspection or temporary exclusion) allowed to INS under the law." Neither the Act nor the regulations allow the Service "to come up with 'functional equivalents' to either detention or parole," and the San Diego District Director cannot claim any kind of plenary power as an excuse to ignore the Act's plain language. "If [the Service] now claims discontent with the statutory mandate," amicus submits, "its concerns are better expressed in a Congressional hearing than before the Board." Accordingly, amicus concludes, the Immigration Judge's decision in this case should be affirmed.

## V. ANALYSIS OF THE PARTIES' POSITIONS

At the outset, we note that there are aspects of each of the parties' positions in this case with which we agree and disagree.

### A. Immigration Judge's Decision

We agree with the Immigration Judge that the language of the statute, principally sections 235 and 236 of the Act, read along with section 212(d)(5)(A) of the Act, indicates that Congress contemplated that aliens seeking admission to the United States, who did not appear to be clearly admissible, in the ordinary course would be detained in custody for further proceedings. The language of section 235(b) stating that an alien "*shall be detained for further inquiry* to be conducted by [an Immigration Judge]" (emphasis added), and the language of section 236(a) that an Immigration Judge shall have authority to determine whether an arriving alien "*who has been detained for further inquiry* under section 235 shall be allowed to enter or shall be excluded and deported" (emphasis added), clearly indicates such an intent. Moreover, the language of section 212(d)(5)(A) of the Act, which directs that a paroled alien, whose purposes of parole have been served, "shall forthwith return or be returned *to the custody* from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" (emphasis added), reflects a congressional understanding that the term "detained" in sections 235 and 236 refers to "custody."

It is not surprising that the statute was drafted in this manner because, when enacted in 1952, detention in the exclusion context was the norm. As the United States Court of Appeals for the Eleventh Circuit has noted: "Prior to 1954 it was INS policy to detain almost all aliens at the port of entry pending a determination of their admissibility. Large detention centers existed for

this purpose at San Francisco, California and Ellis Island, New York." *Jean v. Nelson, supra,* at 1468-69 (citations omitted). In fact, detention in exclusion proceedings had a long history before 1952. The Immigration Act of 1917, 39 Stat. 874, for example, provided for "boards of special inquiry" at *sea and land* border ports "for the prompt determination of all cases of immigrants detained at such ports under the provisions of the law." *See* section 17 of the Immigration Act of 1917.

We also agree with the Immigration Judge that the regulations implementing these provisions of law reflect a similar understanding of the exclusion process. The language of 8 C.F.R. §§ 235 and 236 (1995) is fully consistent with the Immigration Judge's reading of the statute. For example, 8 C.F.R. §§ 235.3(b) and (c) provide that aliens who appear inadmissible shall be detained or paroled. Further, as noted by the Immigration Judge, 8 C.F.R. § 235.3(d) explicitly states: "The Service will assume *custody* of any alien subject to detention under section 235.3(b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger." (Emphasis added.)

Moreover, as the Immigration Judge correctly notes, there is *no* explicit provision in the Act or its implementing regulations authorizing the return of applicants for admission to Mexico or Canada to await future exclusion proceedings, other than the provisions for temporary exclusion in section 235(c), which are inapplicable here.

We do not agree, however, with the Immigration Judge's conclusion that the Service's conduct in this case is akin to the practice of temporary exclusion. Section 235(c) of the Act does not simply provide for the temporary exclusion of an alien pending a hearing by an Immigration Judge; rather, it permits the Attorney General in certain circumstances to order the exclusion of an alien "without any inquiry or further inquiry" before an Immigration Judge. The Service is not arguing that the applicant in this case could or should be found excludable without a hearing (or an opportunity for a hearing) before the Immigration Judge. Rather, the Service urges that the Immigration Judge has greater jurisdiction to conduct such hearings than the Immigration Judge finds he does.

Finally, we note that the decision of the Immigration Judge does not expressly discuss the fact that section 236(a) of the Act provides that an Immigration Judge shall have authority in any case to determine whether an alien who "has been" detained for further inquiry under section 235 should be allowed to enter or should be excluded and deported. Section 236 does not limit the Immigration Judge's authority to cases where the applicant for admission "is" detained.

## B. Service's Arguments

We agree with the Service that Congress and the executive branch have broad authority over, and weighty responsibility regarding, immigration

matters. This country has asserted its right to control the entry and presence of aliens since at least the passage of the Alien Act of 1798, 1 Stat. 570. The Supreme Court has recognized that "[c]ontrol over matters of immigration is a sovereign prerogative, largely within the control of the Executive and the Legislature." *Landon v. Plascenia, supra* at 35; *see also The Chinese Exclusion Case*, 130 U.S. 581 (1889). In fact, the Court has "repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). The Act itself vests broad authority in the Attorney General "to control and guard the boundaries and borders of the United States against the illegal entry of aliens." Section 103(a) of the Act, 8 U.S.C. § 1103(a) (1994). And, the Commissioner of the Service is charged with "any and all responsibilities and authority in the administration of . . . [the] Act . . . as may be delegated to [her] by the Attorney General." Section 103(b) of the Act. These are not matters brought into any dispute by the case before us.

However, one cannot simply "leap" from a general discussion of the broad authority of Congress and the Executive to control immigration to a "pragmatic analysis" of the exclusion policy in issue here. One first looks to the law and its implementing regulations to determine how this immense power has been exercised by Congress and the executive branch.

The principal statutorily-based argument advanced by the Service in this case is that the Immigration Judge erred in "narrowly" construing the word "detained" in sections 235 and 236 of the Act to mean custodial detention. Instead, the Service argues, this word should be construed to mean "to check, to stay, to stop or restrain from proceeding"; i.e, a more reasonable understanding of the statutory language, particularly at land border ports of entry, is that an immigration inspector must "restrain aliens from proceeding into the United States" if they do not clearly appear to be admissible. However, the Service has not directed us to any meaningful support for this interpretation of the law in the statute, its implementing regulations, or caselaw.

The initial difficulty with the Service's argument in this regard arises from the language of the statute itself. Sections 235 and 236 make *no* distinction between procedures to be applied at land border ports and other ports of entry. Moreover, these sections direct that applicants will be "detained for further inquiry," *not* "detained from entering the United States." And, the Service does not explain how its argument in this regard can be reconciled with the language of section 212(d)(5) of the Act and with the relevant implementing regulations at 8 C.F.R. §§ 235.3 and 235.6.

The Service urges that its practice in this regard has survived years of legal scrutiny, but ultimately points to no case that has specifically addressed and sanctioned the exclusion practice in question. The Service cites the language of the Supreme Court in *Shaughnessy v. United States ex rel. Mezei, supra* at 215, that states: "Aliens seeking entry from contiguous lands obviously can

be turned back at the border without more." But the Court there was referring to its decision in *United States ex rel. Polymeris v. Trudell, supra,* which involved two aliens who had been *detained and found excludable* after seeking entry at a land border port. The Court was contrasting the ease with which these aliens could then be excluded from the United States as compared to Mr. Mezei, who had been *detained and ordered permanently excluded* by the Attorney General, but who had been stranded on Ellis Island for years because no other country would take him back.

Further, we do not find the decision of the district court in *Mersereau v. Ingham, supra*, to be of particular significance in resolving this case because it did not address the issue now before us. Rather, as the Service notes, *Mersereau* was decided on other grounds and the legal authority at issue in the present case simply was never challenged. Moreover, *Matter of Nafi, supra,* where we first ruled that in absentia exclusion proceedings could be conducted, even though not specifically authorized by statute, involved an alien who had been paroled into the United States.

The Service has established that the practice at issue here has never been successfully challenged administratively or in the courts. However, the Service has not identified any caselaw affirmatively sanctioning this practice. Rather, it would appear that the issue has simply never been raised until the case before us.

Thus, the Service has not identified any explicit statutory or regulatory authority for the exclusion practice at issue here, nor has it cited any judicial or administrative decision directly on point. The Service, however, also argues that its authority arises from "plenary power" and that its "longstanding" practice should be affirmed because it is a settled interpretation of the Act that has never been amended by Congress.

As recognized above, Congress and the Executive have broad power to control this country's borders. Not only do they have such authority, but most would agree they have the responsibility to ensure the integrity of our borders. However, we first note regarding this issue that, whatever the breadth of the concept of plenary power, it is not a power that attaches to district directors, who have no authority to make nationwide policy determinations.

Although district directors occupy positions of significant importance and authority, the Immigration Judge and amicus are correct that, within the context of arguments related to plenary power, they are "low-level" government officials as contrasted, for example, to the President and the Attorney General. *See Jean v. Nelson, supra*, at 853. As noted above, the statute vests significant authority in the Attorney General to control this country's borders. *See* section 103(a) of the Act. Under section 103(b) of the Act, the Attorney General in turn has delegated the principal responsibility for enforcing the Act to the Commissioner of the Service. *See* 8 C.F.R. § 2.1 (1995). This broad authority, however, has not been redelegated to Service district directors. *See* 8 C.F.R. § 103.1(g)(2)(ii) (1995). Thus, the Service has not established that

the concept of plenary power can be exercised at the district director level, and there is a scarcity of evidence before us that the practice in issue today results from an exercise of plenary power by senior executive officials.

The Service submits, and we agree, that there is a rule of statutory construction that "once terms in a statute acquire settled judicial or administrative interpretations, and Congress subsequently amends or revises that statute without substantial change, it is reasonable to conclude that Congress intended to adopt the settled interpretation." *See Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).

In fact, although somewhat surprisingly not referenced by the parties, we note that in 1974 in an immigration case involving aliens who lived in Mexico and Canada and commuted to the United States to work, the Court concluded that a longstanding administrative construction that such aliens were not nonimmigrants was "entitled to great weight, particularly when . . . Congress has revisited the Act and left the practice untouched." *Saxbe v. Bustos,* 419 U.S. 65, 74 (1974). *Citing Massachusetts Trustees v. United States*, 377 U.S. 235 (1964), and *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), the divided Court stated: "Such a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language." *Saxbe v. Bustos, supra*, at 74. *But see Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.").

Our concern with the Service's argument in this regard is *not* with the underlying principle advanced, but instead is with the evidence (or lack of evidence) presented in support of its claim that the practice of returning some applicants for admission at land border points to Mexico or Canada is a well-known, widely practiced policy of long duration. In this regard, we compare the evidence of the administrative practice presented in *Saxbe v. Bustos, supra,* and the evidence in the case before us.

In *Saxbe v. Bustos*, the Court referenced the fact that the administrative practice in question dated back to 1927 and was supported by a formal Department of Labor ("DOL") general order.[3] That administrative construction in the DOL regulation was carried forward in Department of Justice regulations even prior to 1952. *See* 8 C.F.R. § 110.6 (1947). The practice was reviewed and sustained in various published Board decisions before 1952. *See, e.g., Matter of D-C-*, 3 I&N Dec. 519 (BIA 1949). This Board reaffirmed the validity of the practice after the enactment of the 1952 Act. *See, e.g., Matter of M-D-S-*, 8 I&N Dec. 209 (BIA 1958). Moreover, when the 1952 Act

---

[3] Immigration functions were vested with the Secretary of Labor between 1913 and 1940. The functions and powers of the Secretary of Labor relating to the administration of the immigration and nationality laws were transferred to the Attorney General effective June 14, 1940.

was reported, the Senate Judiciary Committee described the practice in some detail. The resulting Senate Report (S. Rep. No. 1515, 81st Cong., 2d Sess. (1950)) revealed a clear "congressional acceptance of the system." *Saxbe v. Bustos, supra*, at 78. Minor changes to the provisions of the Act relevant to commuters were made in 1965 with no suggestion of change to the administrative practice. Numerous reports by committees of Congress indicated that Congress was "very knowledgeable" about the administrative practice that dated back to 1927 and had not reached a consensus that the policy was wrong. *Id.*

In support of the administrative practice in the case before us, the Service cites to one sentence in its 1982 Operations Instructions 235.6(a) ("When the alien is returned to [a] contiguous territory to await an appointment at a later date, the alien's foreign address shall be noted on the face of the duplicate copy of the [Form I-122]"); one sentence in the INS *Examinations Handbook* ("Deferred inspections from land border ports should be minimal, since inadmissible applicants will normally be required to remain outside the United States until the grounds for excludability are overcome"); a San Diego District Director's memorandum, dated December 26, 1984; and, a single sentence in 1 Charles Gordon et al., *Immigration Law and Procedure*, § 8.09[1], at 8-17 (rev. ed. 1996) ("When an inspection is not promptly completed at a border station, the applicant from an adjacent country can be asked to return at a later time."). In its Supplemental Brief, the Service, without proffering any specific supporting evidence, makes statements regarding its practice at the Canadian border, particularly at its Buffalo District Office.

The Service points to no regulatory support for the practice in question here, no administrative or judicial precedent sanctioning it, nor to any reference in any legislative history reflecting a congressional awareness and approval of the practice. On the present record, there is a rather stark contrast between the evidence in support of the longstanding administrative practice at issue in *Saxbe v. Bustos* and that underlying the practice here.

We find some support for the Service's argument in this regard, but we cannot conclude on the evidence before us that there is a sufficiently established, clear, longstanding, agency-wide administrative construction of the Act to enhance the force of its argument relating to congressional "silence." We note that *Saxbe v. Bustos*, and the cases referenced by the Service on appeal regarding this issue of statutory construction, involved a practice supported by agency regulation or clear evidence of congressional approval of the construction of law, or both. *See Saxbe v. Bustos, supra*, at 74-78; *Lorillard v. Pons, supra*, at 581; *Barrera-Echavarria v. Rison, supra*, at 1444-46; *cf. Brown v. Gardner*, 513 U.S. 115, 121 (1995) ("[T]he record of congressional discussion preceding reenactment makes no reference to the VA regulation, and there is no other evidence to suggest that Congress was even aware of the VA's interpretive position.").

We do agree with the Service that the regulations regarding exclusion proceedings require the Immigration Judge to proceed with an in absentia hearing if there is adequate evidence of notice of hearing. *See* 8 C.F.R. § 3.26(a). However, the Immigration Judge did proceed with an in absentia hearing here; he simply ruled against the Service. The fact that a hearing is conducted in absentia does not divest an Immigration Judge of all authority to rule on issues of jurisdiction or to otherwise rule on issues raised in the case. For example, the Service does not argue that it has authority to require aliens who arrive at airports to return to their home countries to await an exclusion hearing (e.g., to return visitors for pleasure to New Zealand and tell them to appear later at their own expense to establish that they were genuinely nonimmigrant visitors or face in absentia orders of exclusion). Presumably, the Service would not contest in such a case that an Immigration Judge would properly terminate any initiated exclusion proceedings if the alien did not appear for a hearing.

Finally, we agree with the Service that requiring *every* alien who appears at this country's border seeking admission either to be detained or released into American society if they do not clearly appear admissible could lead to dire results. But, that is not a result required by the decision of the Immigration Judge. We note that the Service only asserts the right to employ the practice at issue here at land border ports and it does not allege that dire consequences have resulted at other ports of entry. This argument by the Service does not address the consensual practice of allowing the withdrawal of applications for admission.[4] Most significantly, however, the issue before us is simply whether the Service has the right under existing law and regulation to an in absentia *order of exclusion* if an applicant for admission does not return to pursue that application if he or she is neither detained nor paroled and has been turned away at the border to await a future hearing. The Immigration Judge's decision in this case does not compel the Service to detain or parole any alien. Neither the Immigration Judge nor the Board has the authority to order the Service to do either.

## C.  Arguments of Amicus

We agree with the amicus arguments that the plain language of a statute controls over practical necessity. We similarly agree that a review of some 50 years of administrative and judicial decisions does not reflect any case addressing the issue specifically raised in the present case; i.e., we could find no decision specifically sanctioning the practice urged by the Service. We agree that the statutory and regulatory language, and the apparent arguments advanced by the Service in other cases involving the word "detained" in

---

[4] The Service does not argue that the exclusion practice in issue here results from an agreement between the parties (e.g., a consensual practice akin to a voluntary withdrawal of an application for admission).

sections 235(b) and 236(a) of the Act, reflect that this term in these provisions of law has been understood to refer to "custody." And, we agree that if the issue in this case were to be resolved by the Service's "plenary power" over immigration matters, such power could not simply be exercised by individual district directors.

We do not agree, however, that an Immigration Judge only has jurisdiction to hold an exclusion hearing if an alien is detained or has been paroled. The language of section 236(a), insofar as it refers to an alien who "has been detained," is in our view broad enough to provide the Immigration Judge authority to proceed with an exclusion hearing in the case of an alien who is neither detained nor paroled, but who appears at the exclusion hearing before the Immigration Judge seeking to pursue his or her application for admission. Applicants for admission have a difficult task in seeking to compel the Service to parole them. *See Bertrand v. Sava*, 684 F.2d 204, 211 (2d Cir. 1982) ("Although the discretionary decisions of INS District Directors to parole unadmitted aliens may be judicially reviewed, the scope of the review is necessarily narrow."). In the ordinary course, such applicants understandably have little interest in seeking to force the Service to take them into custody. However, the statute clearly contemplates that they do have the right to establish their admissability before an Immigration Judge unless they come within exclusion grounds related to national security.

Finally, as regards the arguments of amicus, at least based on the present evidentiary record, we agree that the exclusion practice in issue is best addressed through agency regulation or statutory change.

## VI. CONCLUSIONS

The issue before us is whether under existing law and regulation the Service can deny entry to an applicant for admission at a land border port; not detain him, parole him into the United States, or offer him the opportunity to withdraw his application for admission; return him to Mexico with instructions to return for a subsequent exclusion hearing; and then, so long as there is adequate evidence that a notice of hearing was mailed to the last address provided by the alien, demand an in absentia order of exclusion from the Immigration Judge if the applicant does not appear or otherwise participate in the scheduled exclusion hearing.

There is no explicit statutory or regulatory authority for a practice of returning applicants for admission at land border ports to Mexico or Canada to await their hearings. In fact, the language of the statute and present regulations indicates that aliens who appear for inspection (whether at land borders or not) shall either be detained for further inquiry or paroled into the United States. However, the Service urges, and we agree, that the Government has immense power to control this country's borders. The Act specifically vests broad authority in the Attorney General in this regard.

Particularly in light of this "plenary" power, the Service urges that the "longstanding" exclusion policy at issue in this case must be sanctioned by dint of its unchallenged history and the absence of any congressional action to change the practice. But, if the Service's factual statements regarding this exclusion policy are correct, it has offered remarkably little *evidence* in support of this argument. We note that we do not find the absence of explicit administrative or judicial decisions supporting the practice determinative because this is an issue that likely would infrequently be litigated; i.e., aliens who fail to appear at exclusion hearings and who abandon their attempts to lawfully enter this country are unlikely to litigate an exclusion order. Moreover, this Board has certainly reviewed some exclusion cases of this nature and is not aware of the issue presented in this case ever having been raised by a party.

However, as noted above, the evidence offered to establish that this in fact has been a Service-wide practice of long duration is slim. It is not clear from the record before us whether this is a practice that is or has been used in all or only some Service districts; how long the practice has been followed; whether it has been a consistent Service practice; and, what Service-wide standards, if any, have been established for the practice. Other than one district director's 1984 memorandum, we have been offered no written guidance regarding the specific circumstances or limitations under which this policy applies. For example, it is stated on appeal that the practice does not apply to "suspected alien smugglers and aliens convicted of aggravated felonies," but we have been offered nothing to establish that this is Service policy. And, in the case before us, the Service argued before the Immigration Judge that the applicant was caught at the border with some 14 pounds of marihuana hidden in bundles in a compartment in his car, yet he apparently was simply turned away at the border after being served a Form I-122. We do not reference this as part of any evaluation of Service "policy," we raise these points because they lead to questions whether we are confronted with a clear historical *agency* practice or simply with practices at particular Service district offices.

We note that there is no discussion provided by the Service regarding the interplay, if any, between this practice and the process of requesting or encouraging aliens to withdraw their applications for admission. We have not been provided or directed to any evidence that this is a practice known to Congress (e.g., references in committee reports, etc.). And, it is certainly more difficult either to rely on arguments tied to "plenary" power or claims of longstanding agency practice in the absence of a supporting regulation. This is particularly true when the practice would not appear entirely consistent with the language of an existing regulation.

We are not convinced that the present statutory scheme necessarily would preclude a policy such as that espoused by the Service. But, if so, we would expect it to be based on the consent of the parties (e.g., as is the case with the practice of voluntary withdrawals of applications for admission); have

well-established, longstanding roots (e.g., such as were demonstrated in *Saxbe v. Bustos, supra*); or be implemented by a regulation tied to the broad power vested in the Attorney General under section 103(a) of the Act.

In this later regard, we find the situation here somewhat akin to that presented in *Matter of Toscano-Rivas*, 14 I&N Dec. 523 (BIA 1972, 1973; A.G. 1974), which concerned the Service's authority to include a condition prohibiting unauthorized employment in an appearance and delivery bond in connection with a deportation hearing. The Attorney General ultimately concluded in that case that the pertinent statutory provisions authorized this practice, at least in some circumstances, but that the practice "should be specifically governed by a published regulation of the Service." *Id*. at 553-55. The reasons for regulatory support for the policy at issue here appear equally as strong. First, because the statute itself makes no distinction between procedures to be utilized at land border ports and other ports of entry. Second, because there is tension between the practice and the existing regulation at 8 C.F.R. § 235.3. Third, because it is unclear how widespread the present practice is and under what conditions or circumstances it is to be used. And, finally, because this would appear to be a matter in which guidance to both Service officers and the public is important.

## VII.  RULING AND ORDER

The Service does not argue that its "exclusion policy" is a consensual practice. The record does not include sufficient evidence for us to conclude that this "policy" is a longstanding agency practice that, in effect, has been sanctioned by Congress as was the case in *Saxbe v. Bustos, supra*. There is no regulation establishing the policy that implicates the Attorney General's broad authority vested in section 103(a) of the Act to "control and guard" this country's borders. Accordingly, on the record before us, we conclude that the Immigration Judge did not err in terminating exclusion proceedings. Under the present statutory and regulatory scheme, we find that this case is most reasonably viewed as one in which the Service, by simply directing the applicant to leave the country after being served with an I-122, in effect consented to the withdrawal of his application for admission when he elected not to return to the United States to pursue that application.

**ORDER:**     The decision of the Immigration Judge terminating exclusion proceedings is affirmed.

*CONCURRING AND DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I concur with the conclusion of the majority that the Immigration Judge properly terminated exclusion proceedings under the circumstances in the case before us. Simply stated, the Service effectively consented to a

withdrawal of the alien's application for admission in this case, when, following issuance and service of a Notice to Applicant for Admission Detained for Hearing before Immigration Judge (Form I-122), which initiates exclusion proceedings, it permitted the alien to leave the United States and the alien did not appear subsequently to pursue his application in such proceedings.

My reasons for arriving at this conclusion are somewhat distinct from those expressed and adopted in the majority opinion. I believe that the Immigration Judge was absolutely correct when he characterized the issue as a jurisdictional one, and determined that the plain language of the statute did not authorize an exclusion hearing in absentia when an alien has not been detained or paroled within the United States as prescribed by the Act. The Immigration Judge's reasoning is adequately reported by the majority, *see supra* pp. 3-6, and I will not address it in further detail here.

In essence, the Service asserts that it has long engaged in its "exclusion policy" of serving an alien with notice of an exclusion hearing for an undesignated time and place and then requiring the individual to remain outside the United States pending the eventual hearing. The Service argues that this policy, (resulting, in essence, in an alien's exclusion by the Service without a hearing before an Immigration Judge or review before this Board, a practice which, in and of itself, I find to be of some concern), has the endorsement of subsequent legislative enactments which have not in any way disturbed it;[1] that in absentia exclusion hearings are authorized by the implementing regulations once an alien has been served with Form I-122; and that we are in danger of mass influxes of aliens across our borders without this practical means of immigration control.

Much of the dispute over the Immigration Judge's interpretation compared to the Service's position, revolves around the reading of the statutory language concerning the requirement of detention of an alien seeking to enter the United States who does not appear "clearly and beyond a doubt entitled to land." Section 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b) (1994). The statute provides that such detention by the Service is explicitly for the purpose of further inquiry before an Immigration Judge, and that the Immigration Judge has authority to admit or exclude an alien who has

---

[1] There is no express provision in the statute or regulations that authorizes such a practice. To the contrary, the statute does specifically provide for temporary exclusion, but only in the case of an alien who "may appear to the examining immigration officer or the special inquiry officer during the examination before either . . . to be excludable under subparagraph A (other than clause(ii)), (B), or (C) of section 212(a)(3)." Section 235(c) of the Immigration and Nationality Act, 8 U.S.C. § 1225(c) (1994). Silence in the statutory section in question should not be given the same effect as that worked by section 235(c), as no provision of law should be construed to render a word or clause surplusage. *See Kungys v. United States*, 485 U.S. 759 (1988); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *see also Matter of Hou*, 20 I&N Dec. 513 (BIA 1992) (Congress' use of two separate standards requires the Board to give each independent effect); *Matter of Soleimani*, 20 I&N Dec. 99, 105 (BIA 1989).

been so detained. Section 236(a) of the Act, 8 U.S.C. § 1226(a) (1994). The Service argues that the words "detention" or "detained" may be read to mean to "restrain" from entering or to "repulse," while the Immigration Judge gives the term what I find to be its common and accepted meaning of physical custody.

At the very crux of the issue before us is the fact that the alien, with or without having received any further notice of the exclusion hearing, is not present to put forth his position as to how to treat his absence. Consequently, we have received briefing on the issue by the American Immigration Lawyers Association ("AILA"), acting as amicus. Amicus AILA asserts that the language of the statute is plain and was properly understood by the Immigration Judge, and notes further that the Service's proposed reading should be considered against its history and current practice of invoking the statutory language in other contexts as requiring physical custody and confinement for all arriving aliens, subject only to exercise of its discretionary parole authority. I agree.

I believe that the language of the statute is plain, and, therefore, controlling. Manifestly, "detention" or "detain" is not the same as "restrain" or "repulse," and the existence of plenary power does not supplant our duty of allegiance to the controlling principles of statutory construction. The majority acknowledges this point eventually, *see supra* p. 22, but persists in looking for resolution of this matter in the principle that once statutory terms acquire a settled usage and application, subsequent congressional enactments not disturbing the statute may indicate acquiescence or adoption of the construction. *See supra* p. 19. That may be, but not when the language is plain, as it is here; and not when the plain language is markedly different from the Immigration and Naturalization Service's preferred interpretation, which I find to be strained and without support in either established administrative practice or judicial decisions. In such a case, the Supreme Court requires that we and the courts afford the language its plain meaning "and that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984).

It is settled that where the law is plain, subsequent reenactment does *not* constitute Congress' adoption of a construction by the agency which is contrary to the plain statutory language. *See Demarest v. Manspeaker*, 498 U.S. 184 (1991), in which the Supreme Court held that an administrative construction which had been upheld by federal courts of appeal nonetheless was not entitled to deference when the proposed construction was contrary to the plain language of the statute, and *Brown v. Gardner*, 513 U.S. 115 (1994), in which the Supreme Court ruled that a longstanding agency regulation not disturbed by intervening legislation should nonetheless be rejected as being contrary to statutory language.

In *Brown v. Gardner, supra*, the Veterans Administration ("VA") argued that Congress ratified the VA's practice of requiring "fault" when it

reenacted the statute in 1934 and did nothing to change the administrative interpretation. Alternatively, the VA argued, Congress' legislative silence as to the VA's regulatory practice over the preceding 60 years served as an implicit endorsement of its "fault-based" policy. In resolving the issue, the court first noted that the statute did not include "so much as a word about fault." *Id.* at 554-55. Citing *Demarest*, the court repeated the rule that "'[w]here the law is *plain*, subsequent reenactment does not constitute an adoption of a previous administrative construction.'" *Id.* at 556 (emphasis added) (*quoting Demarest v. Manspeaker, supra*, at 190). Further, the court found that congressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute. *Id.* at 557 (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989)).

Thus, I see no reason for the majority's indulgence in a lengthy discussion of *Saxbe v. Bustos*, 419 U.S. 65 (1974), which involved the question of whether to classify alien commuters from contiguous countries as lawful permanent residents or nonimmigrants. While the majority appears to latch on to that case in an effort to help the Service out of its predicament, I'm afraid that effort is unavailing and wholly inconsistent with the majority's concession that the disposition of this case is controlled by the plain language of the statute. *Saxbe* is no different from *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978), which the Service cites for the proposition that where there exists a longstanding agency-wide administrative construction of the statutory language, we should defer. Those cases and that principle simply are inapposite to the present situation in which we are dealing with statutory language which is plain.

Further, I must dissent from the majority's suggestion that our decision in this case is somehow only the result of a failure of proof on the part of the Service. First, I am not persuaded that there is evidence of such a pervasive practice of requiring applicants for admission to remain outside the United States.

To the contrary, while I recognize that applicants for admission at a land border as opposed to other ports of entry, such as an airport, may be treated differently, detention is the norm.[2] It is the more familiar scenario, borne out by repeated habeas corpus petitions in which aliens so detained have sought release on parole, that the Service routinely detains in custody all persons

---

[2] Even the title of Form I-122 contemplates detention. Further, Service-imposed detention regulations include 8 C.F.R. § 212.5, 235.3(b) and (c), and 235.6 (1995), each of which contemplates physical custody or parole therefrom. Under the regulations at 8 C.F.R. § 235.3(b), aliens will be automatically detained if they: (1) arrive without documents (except where waived under 8 C.F.R. § 211.1(b)(3) (1995) or 8 C.F.R. § 212.1 (1995)); (2) arrive with documents which appear on their face to be false, altered, or to relate to another person; (3) arrive at a place other than a designated port of entry. See *Singh v. Nelson*, 623 F. Supp. 545 (S.D.N.Y. 1985); Ishtaq v. Nelson, 627 F. Supp. 13 (E.D.N.Y. 1983). Moreover 8 C.F.R. § 235.3(c) specifically addresses the considerations involved in adjudicating release from custody.

seeking admission, often indiscriminately without even exercising the discretion found in the statute, the regulations, and agency policy proclamations. *See, e.g., Jean v. Nelson*, 472 U.S. 846 (1985); *Marczak v. Greene*, 971 F.2d 510, 515-18 (10th Cir. 1992); *Mason v. Brooks*, 862 F.2d 190 (9th Cir. 1988); *Garcia-Mir v. Smith*, 766 F.2d 1478, 1485 (11th Cir. 1985), *cert. denied sub nom. Marquez-Medina v. Meese*, 475 U.S. 1022 (1986); *Bertrand v. Sava*, 684 F.2d 204, 211 (2d Cir. 1982); *Noorani v. Smith*, 810 F. Supp. 280 (W.D. Wash. 1993); *Pierre v. United States INS*, 793 F.Supp. 440 (E.D.N.Y. 1992); *Li v. Greene*, 767 F. Supp. 1087 (D. Colo. 1991); *Gutierrez v. Ilchert,* 682 F. Supp. 467, 472 (N.D. Cal. 1988); *Gallego v. INS*, 663 F. Supp. 517 (W.D. Wis. 1987).

Second, our concern should be not so much with the absence of any evidence provided by the Service in support of its position, *see supra* p. 20, as with the fact that it is doubtful such evidence, if it exists, would withstand scrutiny when compared to the plain statutory language and the Service's own declarations in other contexts that the "detention/detained" language in sections 235 and 236 refers to the requirement of physical custody. *Demarest v. Manspeaker, supra.*

Third, there is the very real issue of notice lurking in the position urged by the Service. Certainly as pragmatic a concern as those advanced by the Service is how, assuming a hearing was scheduled, the applicant would ever receive reasonable notice of such a hearing, provide a change in address or delivery information from that supplied at the land border, or be assured of reliable delivery.

Further, the majority affirms the interpretation of the Immigration Judge up to the point that it reads him to suggest that the Service is engaging in temporary exclusion. *See supra* p. 17. Despite the distinction made by the majority that section 235(c) precludes a hearing, and that here, the Service wishes to proceed with one, albeit in absentia, I don't know how else to describe the practice in which the Service is engaging and which it claims is a longstanding policy.

In my view, when an alien seeks admission, is not admitted, and is returned involuntarily to a point outside our borders, he or she is excluded, although not in compliance with the process described in the statute and regulations and without the imprimatur of the Immigration Judge's order or the statutory consequences which would ordinarily accompany such an order. It may not be for this Board to go so far as to address the possible constitutional implications of such a practice; however, I must conclude that such "exclusion" is tantamount to withdrawal of the application and divests the Immigration Judge of jurisdiction over the applicant even where there is a Form I-122 outstanding. *Cf. Matter of Lin*, 18 I&N Dec. 219, 222 (BIA 1982) (finding that escape from detention does not divest the Immigration Judge of authority to conduct exclusion proceeding).

I do agree, however, that the Immigration Judge's jurisdiction over an alien who is the subject of a Form I-122 can vest by a subsequent appearance by the applicant at a scheduled hearing. Should that alien be fortunate enough to receive any further notification of an opportunity for a hearing and present him or herself at the border, he or she can be treated then, as well as throughout the time during which the hearing is conducted, as continuing to apply for admission. *Matter of Kazemi*, 19 I&N Dec. 49, 51 (BIA 1984). I find that such voluntary submission to the jurisdiction of the Immigration Court protects the applicant's notice interests, while not unnecessarily tying the Immigration Judge's hands in such cases. With that exception, I see no basis to conclude that an exclusion hearing may be conducted when the legal fiction that an applicant for admission is not really here in the United States, has by reason of the Service's actions, become the reality.